EL PUEBLO DE PUERTO RICO, apelado, *v.* EDELMIRO RÍOS MALDONADO, apelante.

*Número:* CR-89-85 *Resuelto:* 9 de diciembre de 1992

*Carmen M. Quiñones Núñez* y *Juan S. Pagán,* abogados del apelante; *Nellie Hernández, Fiscal Auxiliar, Anabelle Rodríguez, Subprocuradora General,* y *Ricardo Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Tres (3) son las cuestiones que nos ocupan en esta apelación. En primer lugar, debemos examinar si el apelante tuvo una representación legal adecuada. En segundo lugar, debemos determinar si el aquí apelante tenía la capacidad mental suficiente para responder por los actos que se le imputan. Finalmente, si la prueba de cargo fue suficiente para probar su culpabilidad más allá de duda razonable. Resolvemos que estuvo adecuada y efectivamente representado; que tenía la capacidad mental suficiente, y que el Ministerio Público probó su culpabilidad con el *quantum* de prueba requerido. Por ello confirmamos las sentencias del foro de instancia.

I

Contra Edelmiro Ríos Montalvo (el apelante) el Ministerio Público presentó cuatro (4) cargos por actos lascivos e impúdicos alegadamente cometidos contra cuatro (4) de sus hijos menores de edad[1] entre 1983 y 1988. Celebrado

---

[1] Los niños perjudicados fueron A.R.R. (6 años); S.R.R. (5 años), J.L.R.R. (3 años) y J.R.R. (2 años). El apelante y su esposa procrearon otros dos (2) niños durante su matrimonio.

el juicio, por tribunal de derecho, fue encontrado culpable de todos los cargos y sentenciado a ocho (8) años de cárcel en cada cargo, a ser cumplidos consecutivamente. Inconforme, acude ante nos y aduce que:

A. Erró el Honorable Tribunal de Primera Instancia al encontrar culpable al acusado cuando se probó que éste carecía de capacidad suficiente para comprender la criminalidad de los actos imputados por ser éste un retrasado mental.

B. Erró el Honorable Tribunal Sentenciador al admitir testimonios basados y obtenidos en pruebas científicas que no fueron demostradas ni realizadas en corte para que el acusado tuviera la oportunidad de observarlas y contrainterrogar efectivamente.[2]

C. La conducta profesional de la representación legal del acusado vulneró su derecho constitucional garantizado, tanto por nuestra Constitución y la Constitución de los Estados Unidos, de efectiva representación legal.

D. Erró el Honorable Tribunal al declarar NO HA LUGAR la moción de absolución perentoria solicitada por el acusado.

E. Erró el Tribunal al encontrar culpable al apelante con prueba insuficiente para su convicción más allá de duda razonable. Alegato, págs. 24, 29, 32 y 36.

Para evaluar estos señalamientos en su justa perspectiva, se impone una síntesis de los testimonios y la prueba que desfiló ante el foro de instancia.

## II

La psicóloga y terapista de niños abusados sexualmente, Dra. Doris González de Knudson, declaró que allá para 1989 la madre de los niños y esposa del apelante, Sra. Ángeles Magaly Rivera Ortiz, fue referida al Centro de Ayuda a Víctimas de Violación que ella dirigía para recibir

---

[2] Obviamente, el apelante se refiere al testimonio de la Dra. Doris González de Knudson, psicóloga y terapista de niños abusados sexualmente. El testimonio de esta perito fue objeto de amplio contrainterrogatorio por parte de la defensa. Entonces, no se cuestionó su testimonio sobre el uso de muñecos terapéuticos. El señalamiento de error, que ahora levanta el apelante, es tardío e insubstancial, por lo que no lo discutiremos.

ayuda para los cuatro (4) niños perjudicados.(³) En aquellos momentos, la madre de los niños se encontraba en un proceso judicial en el Tribunal de Distrito de Manatí porque su esposo (apelante) había solicitado la custodia y/o derechos de visita de sus hijos luego de que aquella abandonara el hogar a causa del maltrato físico y emocional al que éste la sometía.(⁴)

La doctora González de Knudson realizó cuatro (4) entrevistas a los menores, en ocasiones separadamente y en ocasiones en grupo, que se extendieron desde enero a marzo de 1989. Entrevistó a la madre de los niños en igual número de ocasiones para corroborar la información que le suministraban los niños. El primer niño que entrevistó la doctora González de Knudson fue J.L.R.R. Éste le manifestó que en su casa había dos (2) cuartos y en uno dormía su madre y las tres (3) hermanitas, y en el otro dormía él y su papá, y que su papá acostumbraba, cuando dormía con él, ponerle el pipí (pene) en su ano. El niño le relató que lloraba mucho cuando eso sucedía porque le dolía y no le gustaba que le hiciera eso.

En las entrevistas que hizo la doctora González de Knudson con las hermanitas de J.L.R.R., éstas manifestaron que ellas lo escuchaban llorar, pero cuando le preguntaban al padre qué le pasaba al nene éste contestaba que era que le había tenido que pegar porque se había orinado en la cama. Cuando la doctora González de Knudson le preguntó al menor si en efecto él se orinaba en la cama, el niño le contestó que no, que su padre se le orinaba encima y en la cama y entonces le pegaba. Así, cuando la madre entraba a ver la cama, en efecto estaba orinada.

El menor J.L.R.R. también le relató que su padre acos-

---

(³) La señora Rivera Ortiz fue referida al Centro de Ayuda a Víctimas de Violación por la Sra. Luz Delia Rosario Arroyo, Trabajadora Social del Hogar Ruth de Vega Alta, que daba albergue a mujeres víctimas de maltrato conyugal y a sus hijos.

(⁴) Es así como la señora Rivera Ortiz llega al Hogar Ruth referida por la empleada del Departamento de Servicios Sociales Yolanda López.

tumbraba bañarlo y que mientras se bañaban le ponía el pene (pipí) en la boca y en el ano, y que él también gritaba. Cuando la doctora González de Knudson confrontó a las hermanitas y a la madre acerca de escuchar tales gritos, éstas contestaron (por separado) que los escuchaban, y que cuando la madre preguntaba al padre (apelante) la razón de los gritos, éste contestaba que se debía a que "no se quería bañar".

La doctora González de Knudson declaró, también, que el menor le relató que el apelante lo llevó a casa de un amigo y ese amigo de su papá le hizo lo mismo que le hacía su padre. El menor le relató, además, que el apelante lo agredía por el cuello en el área de las cuerdas vocales. Las hermanas del menor le relataron a la doctora González de Knudson que le pegaba en esa área "para hacerlo gago, para crearle un impedimento del habla". El niño tiene cierta dificultad al expresarse.

Continúa declarando la doctora González de Knudson que el niño le expresó ser víctima constante de agresiones físicas. Le expresó, además, que cuando "fuera grande iba a matar a Edelmiro Ríos".

Finalmente, en cuanto a J.L.R.R., la doctora González de Knudson señaló que lo observó "con mucho miedo, mucho temor".

La doctora González de Knudson atestó que las dos (2) niñas mayores (A.R.R. y S.R.R.) le relataron varios incidentes donde el apelante cometía abuso sexual con ellas en, ocasiones en que la mamá se encontraba hospitalizada o recibiendo tratamiento médico debido al asma que padece ésta. Las niñas mayores le relataron que el padre acostumbraba ponerle el pipí (pene) en la boca, tocarle el área genital y rozarle la vagina de ellas con su pene. Todo ésto se lo mostraron las niñas con muñecos que la doctora González de Knudson utiliza en las terapias. Cuando la madre estaba hospitalizada o recibiendo tratamiento médico, el

padre no las enviaba a la escuela, sino que las mantenía en el hogar para cometer los actos sexuales.

Las niñas mayores le confiaron a la doctora González de Knudson que ellas no habían contado a nadie lo que le relataron porque su padre (apelante) había amenazado la vida de todos ellos, incluyendo la de la madre. Las niñas le manifestaron, además, que el padre las agredía fuertemente y ese temor por el carácter violento del padre, unido a su visión de la madre como una persona incapaz de defenderse y defenderlas, las hizo callar lo que estaba pasando.

En cuanto a la niña menor (J.R.R.), la doctora González de Knudson declaró que por ser pequeña no tenía mucha capacidad para poder expresarse, pero con gestos y utilizando los muñecos terapéuticos del Centro de Ayuda a Víctimas de Violación la niña hizo gestos de que su padre también le ponía el pipí (pene) en la boca y le rozaba el pene en el área vaginal.

Conforme el testimonio de la doctora González de Knudson, el relato de estos niños le merecía a ella total credibilidad por la consistencia entre los relatos y por el envolvimiento emocional de los niños con lo que relatan.

Según la doctora González de Knudson, en este caso "estamos hablando de niños consistentes, niños emocionalmente partícipes de lo que relatan, niños que cuando ella reúne otros niños en otros momentos, puede verificar lo que otro niño le dijo cuando los otros no estaban presentes, y niños que se les haría más fácil no tener que relatar lo que han relatado, porque el proceso de relatar es bien doloroso". E.N.P., pág. 12.

Finalmente, durante su testimonio, la doctora González de Knudson expresó que confrontó a la madre con la información que le dieron los niños y la reacción de ésta fue de llanto y dolor porque desconocía esos detalles de lo que había pasado.

Los cuatro (4) niños testificaron durante el juicio. Du-

rante el examen directo, los niños declararon sobre los actos sexuales a los que fueron sometidos por el apelante. *Corroboraron en toda su extensión el testimonio de la doctora González de Knudson sobre los actos sexuales específicos que les hacía su padre; en el lugar y en las circunstancias tal cual lo relataron a la doctora.*

Las niñas añadieron que el apelante les " 'chupaba la tota (vagina) con la boca' ". E.N.P., pág. 21. A.R.R. señaló que el apelante le besaba el cuello diciéndole " 'mi amor y la besaba en la tota' ". E.N.P., pág. 21. Añadió que en una ocasión observó al apelante besándole el "pipí" a su hermanito J.L.R.R. cuando lo estaba bañando. De igual manera, S.R.R. señaló que el apelante le decía "mi amor" mientras le besaba la "totita" (vagina). J.L.R.R. añadió que el apelante le " 'lambía el culo' ". E.N.P., pág. 40.

Todos los testimonios de estos niños durante el contrainterrogatorio fueron consistentes en negar que alguien les hubiera dicho que dijeran lo que habían declarado; que nadie les pidió que contestaran en determinada forma; nadie les dijo cómo declarar. De igual manera, se reafirmaron en que lo que habían relatado era la verdad.

La esposa del apelante y madre de los niños (señora Rivera Ortiz) testificó que se fue de su casa porque el apelante la maltrataba a ella y a sus nenes. A ella le daba "pelas" desde que se casaron. Luego de comunicarse con la Sra. Yolanda López, técnica del Departamento de Servicios Sociales, se fue a vivir junto a los niños al Hogar Ruth de Vega Alta. Allí fue que, luego de estar viviendo dos (2) meses, su nene J.L.R.R. se pone fresco con unas nenas del hogar y la Sra. Luz Delia Rosario Arroyo le dice que sospechaba que el niño había sido objeto de abuso sexual. De ahí refieren a los niños al Centro de Ayuda a Víctimas de Violación y se descubre el abuso sexual al que fueron sometidos sus hijos.

La señora Rivera Ortiz señaló que antes de que las empleadas del Hogar Ruth le dijeran sobre las sospechas de

abuso sexual, ella no tenía idea de que eso estuviera pasando dentro de su hogar. Atestó que nunca tuvo relaciones sexuales con el apelante delante de los niños.

Durante el contrainterrogatorio, la señora Rivera Ortiz admitió que el Sr. Wilberto Galíndez Castro fue su amante y que en cierta carta o conversación le pidió al señor Galíndez que matara a su esposo. Sin embargo, negó que estuviera utilizando a sus hijos para encarcelar a su esposo y así continuar las relaciones amorosas con su amante. Adujo que lo ocurrido a sus hijos no lo inventó. Señaló que de eso se vino a enterar luego de salir de su hogar y estar residiendo en el Hogar Ruth.

La Sra. Luz Delia Rosario Arroyo, Trabajadora Social del Hogar Ruth, declaró que la señora Rivera Ortiz llegó a dicha institución en marzo de 1988 porque estaba siendo maltratada física y emocionalmente por el apelante. Corroboró que fue en el Hogar Ruth donde notaron una conducta extraña en el niño J.L.R.R., lo que les hizo sospechar que era víctima de maltrato sexual. Señaló que "el niño [J.L.R.R.] acostumbraba tirar piedras, asumía una conducta bastante agresiva, peleaba todos los días prácticamente con los niños del albergue y en una ocasión durante el juego él comenzó a desnudarse, se quitó la ropa y le pidió a una de las niñas que estaba en el círculo que practicara el sexo oral con él, le decía 'chúpamelo, chúpamelo' ". E.N.P., pág. 61. En cuanto a las niñas, observó que su aprovechamiento escolar era bien pobre.

Expresó la señora Rosario que cuando le relató a la madre de J.L.R.R. lo que habían observado del niño, ésta "se puso bastante emotiva, reaccionó en crisis prácticamente porque ella no podía creer que esto le estuviese sucediendo". E.N.P., pág. 63.

Finalmente, la Trabajadora Social del Centro de Ayuda a Víctimas de Violación, Sra. Amalie Torres Domínguez, declaró que ella comenzó la terapia de los niños en el centro. Señaló que durante la exhibición de una película

sobre el tema del abuso sexual, desde un enfoque preventivo, las niñas A.R.R. y S.R.R. mostraron un comportamiento sospechoso que indicaba un posible abuso sexual. Tenían mucho temor, una mirada de susto, se miraban dándose mensajes que ella interpretó en ese momento que las niñas se decían "no vamos a hablar". En específico, señaló que S.R.R. comenzó a llorar durante una escena que mostraba a un familiar abusando sexualmente a un niño. En cuanto a J.L.R.R. señaló que el niño escogió entre los muñecos de terapia a un muñeco grande y a otro pequeño, los desvistió y los puso de frente uno del otro, sentó el muñeco pequeño en la falda del muñeco grande y comenzó a representar al muñeco grande bañando al pequeño señalando que lo hacía duro y mirando el muñeco pequeño decía "le duele, le duele". El niño estaba absorto en la escena al punto que no escuchaba a la testigo cuando le hablaba. Además, el niño tomó el muñeco grande y le puso el pene de ese muñeco dentro de la boca del muñeco pequeño. También los colocó en posición del acto sexual.

La señora Torres, luego de observar esos indicadores, refirió a los niños a la doctora González de Knudson para una evaluación más profunda.

Con el testimonio de la señora Torres, el Ministerio Público sometió su caso. La defensa solicitó la absolución perentoria del apelante. El foro sentenciador denegó dicha solicitud. La defensa procedió con la presentación de su prueba.

Como primer testigo de la defensa declaró el Sr. Wilberto Galíndez Castro. Éste declaró que fue amante de la señora Rivera Ortiz (esposa del apelante) desde diciembre de 1986 a julio de 1987. Sostuvo que mantenía relaciones sexuales con la madre de los niños en el monte, en los moteles(5) y en una ocasión en la casa del apelante. Señaló

---

(5) El señor Galíndez atestó que la señora Rivera Ortiz llevaba consigo a las dos (2) niñas mayores cuando iban a los moteles y las dejaba en el estacionamiento

que en esa ocasión los niños estaban en la sala de la casa. Declaró que en otra ocasión el apelante estaba en el hogar y la señora Rivera Ortiz le cogió el pene con las manos frente a las niñas.

El señor Galíndez adujo que terminó su romance con la señora Rivera Ortiz cuando ella lo mandó a matar al apelante. Señaló, además, que la señora Rivera Ortiz le manifestó que si él no lo mataba ella iba a buscar todos los medios para "meter preso" al apelante. Sin embargo, no le dijo de qué delito lo iba a acusar ni le mencionó nada sobre las relaciones del apelante con sus hijos.

En el contrainterrogatorio, el señor Galíndez manifestó que tenía relaciones sexuales con la esposa de su amigo (apelante) porque ella lo obligaba diciéndole palabras deshonestas.

La Sra. Carmen Galíndez Ruiz declaró ser la tía del señor Galíndez Castro. Éste residía en su casa. Ella se enteró de que la señora Rivera Ortiz enviaba cartas de amor a su sobrino con dos (2) de las niñas.

La Sra. Ana Nydia Miranda Ríos, sobrina del apelante, declaró que acompañó a su tío durante todo el proceso porque éste no entendía lo que ocurría en las vistas. Señaló, además, que ella tiene cinco (5) niños y en varias ocasiones los dejó bajo el cuidado del apelante sin que sus hijos se quejaran de actos lascivos en su contra.

La técnica de Servicios Sociales, Yolanda López, declaró que fue la persona que investigó la querella por maltrato conyugal contra el apelante. Fue ella quien gestionó el albergue de la señora Rivera Ortiz en el Hogar Ruth de Vega Alta. Señaló que tenía dudas de que el apelante hubiera cometido los actos que se le imputan. Sin embargo, nunca realizó una entrevista formal con la madre y los niños. Su investigación del caso se limitó a gestionar el albergue

mientras sostenía relaciones sexuales con él.

para la madre y los niños y a mediar a favor del apelante en el pleito de custodia de los niños.

Luego de una discusión sobre lo oportuno de la solicitud de la defensa de presentar prueba pericial sobre la condición mental del apelante, el foro de instancia escuchó el testimonio de la Dra. María Soledad Pinto y del Dr. Alejandro López Deynes.

La doctora Pinto declaró ser psicóloga clínica. Ésta sometió al apelante a un *examen psicométrico* para evaluar su edad mental y su funcionamiento intelectual. *De dicho examen concluyó que, aunque el apelante tiene una edad cronológica de cuarenta y dos (42) años, su edad mental es de un niño de nueve (9) años y seis (6) meses y su cociente intelectual es de sesenta y seis (66).*[6] *De acuerdo con esos resultados, lo catalogó como un retardado mental.*

Para la doctora Pinto, la conducta del apelante en estos hechos sólo puede ser producto de la ignorancia, por el desconocimiento, por la ingenuidad y quizás por la curiosidad. Ella no considera esa conducta como criminal, sino que entiende que el apelante actuó como un niño curioso guiado o enseñado por un adulto (que luego dijo que posiblemente era la esposa). Según la doctora Pinto, era muy probable que el apelante naciera con retardación mental,[7] y que no le permitió desarrollar su capacidad intelectual a la par con su desarrollo físico. Explicó que a pesar de que el apelante cursó hasta el quinto grado de escuela elemental, sus calificaciones fueron todas "F" y era pasado de grado por las autoridades escolares para que el padre del apelante obtuviera la benevolencia del Departamento de Servicios

---

[6] El cociente intelectual (I.Q.) de una persona de inteligencia normal fluctúa entre noventa (90) a cien (100).

[7] La doctora Pinto señaló que la retardación mental se diferencia de la locura en que es una disfunción de la conciencia o capacidad intelectual, mientras que la locura se trata del deterioro de las funciones mentales. No hay evidencia en autos de la tara hereditaria del apelante.

Sociales en la concesión de una ayuda económica. De hecho, el apelante no sabe leer ni escribir.

Finalmente, *la doctora Pinto diagnosticó que el apelante puede ser adiestrado debidamente para llevar a cabo las actividades típicas cotidianas y puede desarrollar algunas destrezas a su tiempo*, pero que no tiene cura porque no se trata de una enfermedad mental sino de un retraso mental.

En la repregunta la doctora Pinto señaló que entrevistó al apelante sólo en dos (2) ocasiones en entrevistas de una hora de duración. Señaló que éste fue llevado a su oficina para ser evaluado con relación al caso de custodia de los niños que se ventilaba en el Tribunal de Distrito de Manatí.

Admitió la doctora Pinto que nunca ha participado en cursos o ha recibido adiestramiento sobre Maltrato o Abuso Sexual de Niños. *Tampoco pudo contestar por qué siendo el apelante, según ella, un retardado mental, no cometió los actos a la vista de los demás.*

El sexólogo Dr. Alejandro López Deynes atestó que tuvo una conversación de aproximadamente dos (2) horas de la cual puede concluir, y concurrir con la doctora Pinto, *que éste es un retardado mental.* Según el doctor López Deynes, el apelante no le pudo contestar su edad ni su fecha de nacimiento y su comportamiento durante la entrevista era la de un niño. Con relación a los hechos del caso señaló que lo que pasa es que se ve un cuerpo de adulto con mente de niño y eso prejuicia al que observa. Según él, la edad mental del apelante no le permite asimilar el proceso de lo que es definición sexual, de lo que es un acto sexual, una obseción o un ataque sexual. Por ello, de haber cometido los hechos que se le imputan, los habría cometido *de juego, no de crimen.*

En el contrainterrogatorio, el doctor López Deynes reconoció que una evaluación para determinar disfunción

sexual no se hace en una o dos (2) horas de entrevista. Reconoció, además, que la mayor parte de la información sobre el apelante durante la entrevista la recibió de la hermana del apelante.

La defensa presentó varios testigos de reputación.(8) En síntesis, declararon que *el apelante tenía buena reputación en la comunidad, era una persona respetuosa, era tímido, que realizaba trabajos de limpiar patios, pintar verjas, botar la basura, etc.* Unos atestaron tener hijos menores y no haber recibido queja de éstos cuando el apelante se quedaba solo con ellos. *Todos atestaron que el apelante realizaba bien sus trabajos y que nunca habían tenido que pagar para corregir los mismos.*

Luego de presentados estos testigos, la defensa reprodujo su moción de absolución perentoria. Argumentó que aun cuando se le diera crédito a la prueba de cargo, surgía de su prueba pericial médica que el apelante era inimputable debido a su condición de retrasado mental. El foro sentenciador denegó la solicitud. La defensa solicitó, entonces, que el foro sentenciador ordenara una evaluación psicométrica del apelante a un psicólogo clínico nombrado por el tribunal, a tenor con la Regla 240 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. El Ministerio Público se opuso a tal petición. El foro sentenciador denegó la misma.

Una vez las partes rindieron sus respectivos informes finales, el caso quedó sometido. El foro sentenciador dictó fallo condenatorio en los cuatro (4) cargos de actos lascivos e impúdicos imputados. Refirió al acusado a la Oficina de Sociopenales para el correspondiente informe presentencia y señaló fecha para dictar sentencia.

En el interin, la defensa solicitó que el apelante fuera sometido a evaluación psiquiátrica para determinar si estaba procesable y comprendía la naturaleza y el propósito del acto de dictar sentencia. El foro de instancia concedió

---

(8) Entre ellos, Federico Rivera Vidal, Alicea Cebollero y Ada J. Rivera González.

la solicitud. Luego de que fuera celebrada una vista de procesabilidad, en la cual declararon la Dra. Alina Vales(⁹) y el Dr. Justo P. Rodríguez Valle,(¹⁰) el caso quedó sometido para dictar sentencia.

El foro sentenciador concluyó que, luego de analizar la prueba de ambas partes, entendía que el apelante era capaz de comprender la naturaleza y el propósito de los procedimientos y participar en el acto de la imposición de la sentencia con pleno conocimiento de su significado. Procedió a imponerle ocho (8) años de presidio en cada uno de los cuatro (4) cargos, a ser cumplidos consecutivamente. Se le denegó el beneficio de una sentencia suspendida.

De esas sentencias recurre ante nos el apelante.

## III

Discutimos, en primera instancia, el señalamiento de error relacionado con la falta de representación legal eficaz y adecuada del apelante, pues de haberse cometido el mismo, procedería la revocación de las sentencias y la celebración de un nuevo juicio. *Cf. Pueblo v. Morales Suárez*, 117 D.P.R. 497 (1986).

---

(⁹) *En síntesis, la doctora Vales declaró que tenía que descartar la posibilidad de que el apelante sufriera de retardación mental porque no existían récord o diagnósticos en tal sentido anteriores a la edad de dieciocho (18) años del apelante.* De acuerdo con esta perito, la retardación mental se tiene que establecer antes de esa edad porque, por definición, es un problema del desarrollo. Véase American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorder*, Third Edition (DSM III), Washington, D.C., A.P.A., 1980, págs. 40–41. *Describió la conducta del apelante durante su entrevista como muy recta, sin reservas al hablar, educado y entendía lo que ella le decía. Solo encontró que el apelante estaba ansioso, deprimido y preocupado por sus hijos.*

(¹⁰) *El doctor Rodríguez Valle atestó que el grado de retraso mental del apelante, si alguno, es leve. Dijo que éste no presenta ningún síntoma emocional que lo exima de cumplir su responsabilidad. Durante su entrevista se mostró tranquilo, coherente, relevante, correcto, contestó adecuadamente sus preguntas y no estaba irritable o alucinando.* Señaló que los términos "fronterizo" y "limitado" que utiliza la doctora Pinto en su informe psicométrico para describir al apelante no son términos de retraso mental severo ni profundo. *Señaló que durante su entrevista el apelante se comportó como un adulto y no como un niño.*

■ Aduce el apelante que su representación legal a nivel de instancia[11] no fue eficaz y adecuada porque su abogado no presentó la defensa de insanidad por retardación mental de acuerdo con la Regla 74 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, sino que levantó la misma tardíamente. Ese hecho, sostiene, llevó al juzgador a no darle crédito a los peritos de la defensa. Entiende el apelante que si su representación legal hubiera notificado oportunamente dicha defensa, el juez hubiera llegado, "con razonable probabilidad, a una conclusión distinta respecto a la responsabilidad del acusado". No tiene razón.

De la exposición narrativa de la prueba surge con meridiana claridad que el foro de instancia, a pesar de que cuestionó lo oportuno de la prueba pericial de la defensa sobre capacidad mental del apelante, escuchó y aquilató esos testimonios al momento de decidir y emitir su fallo. Adviértase que aquí el Ministerio Público no objetó la introducción en evidencia de esos testimonios. Renunció así a objetar la presentación tardía de esa prueba.

Cuestiona el apelante que la defensa no utilizó el mecanismo de la Regla 95 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, para descubrir prueba exculpatoria. En especial, cuestiona que su abogado no solicitara los expedientes médicos de los niños que obraban en el Centro de Ayuda a Víctimas de Violación, de los cuales podía surgir prueba para impugnar el testimonio de los niños y el de la doctora González de Knudson. El señalamiento es frívolo. Basta con una lectura de la exposición narrativa de la prueba para percatarse del incisivo, persistente y consistente contrainterrogatorio al que fueron sometidos todos los testigos de cargo, en especial los niños y la doctora González de Knudson. Lo que sucede es que esos testimonios, consis-

---

[11] A nivel de instancia estuvo representado por el Lcdo. Jorge Arroyo Fernández. A nivel apelativo está representado por la Lcda. Carmen N. Quiñones Núñez.

tentes y corroborativos entre sí, resultaron inespugnables y devastadores para la defensa. Esa realidad no variaba fuera éste u otro el abogado defensor. *Pueblo v. López Gumán*, 131 D.P.R. 867 (1992).

De otro lado, resultaba cuestionable que de los récord de los niños en el Centro de Ayuda a Víctimas de Violación surgiera evidencia exculpatoria o beneficiosa para la defensa impugnar los testimonios de los niños.

■ Sabido es que todo acusado de delito tiene el derecho constitucional a tener una representación legal adecuada y efectiva. Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1; *Pueblo v. Morales Suárez*, supra. En este caso señalamos que existe una fuerte presunción de que las actuaciones del defensor caen dentro del ámbito de una razonable asistencia legal y que corresponde al apelante demostrar la incompetencia enervante de su derecho. Ello a tal grado extremo que tales actuaciones u omisiones le causaron un perjuicio sustancial de tal magnitud que, de no haber incidido en las mismas, existía la probabilidad de que el resultado del juicio habría sido distinto. Para ello hay que analizar todas las circunstancias concurrentes en el caso.

Por lo discutido anteriormente, concluimos que en este caso el resultado habría sido el mismo. En primer lugar, el señalamiento sobre presentación tardía de la defensa de locura y el efecto de tal tardanza es especulativo.[12] En segundo lugar, el señalamiento sobre el descubrimiento de prueba puede considerarse como un error de juicio en la estrategia que no justifica la revocación de las sentencias.

---

[12] Cabe señalar, además, que la defensa del apelante no solo descansó en la defensa de locura, sino que durante todo el proceso intentó probar que la esposa de éste, mediante maquinaciones incidiosas y manipulación sobre sus hijos, los convenció para que los niños inventaran lo del abuso sexual. Con ello trató de crear la duda razonable en cuanto a la versión de los niños, apuntando el motivo de la esposa para deshacerse del marido, y así continuar con su amante confeso, como el móvil de las acusaciones.

Lo cierto es que la prueba de cargo fue abrumadora en cuanto a establecer los elementos constitutivos del delito y su conexión con el acusado. Como veremos adelante, en cuanto a la capacidad mental del apelante al momento de cometer los hechos, la prueba de cargo demostró la capacidad del apelante para comprender la criminalidad de los actos imputados.

█ El "criterio final para adjudicar una reclamación de falta de efectividad en la defensa debe ser si la actuación del abogado de tal modo vulneró el adecuado funcionamiento del sistema adversativo que no pueda decirse que el juicio tuvo un resultado justo". *Pueblo v. Morales Suárez*, supra, págs. 501–502. En el caso de autos, estamos convencidos de que el apelante tuvo un juicio justo cuyo resultado también fue justo. *Pueblo v. López Guzmán*, supra.

## IV

Sostiene el apelante que por padecer de retardación mental es inimputable de los delitos por los que se le acusó, aun cuando quedara probado que cometió los mismos.

█ Sabido es que para que una persona sea penalizada por un acto o una omisión, éstos deben ser intencionales o negligentes. Art. 14 del Código Penal, 33 L.P.R.A. sec. 3061. Esa intención o negligencia se manifiesta mediante las circunstancias relacionadas con el delito, *la capacidad mental*, las manifestaciones y la conducta del acusado. Sin prueba del elemento mental del imputado no puede configurarse el delito. En casos como el de autos, donde se imputa un delito de intención específica y donde no existen manifestaciones del imputado que reflejen su estado anímico al momento de cometer los hechos, el Ministerio Público depende de la prueba relacionada con las circunstancias en que se comete el delito para probar el

elemento de la intención criminal. *Pueblo v. Torres Nieves*, 105 D.P.R. 340, 346 (1976).

▮▮▮ Ahora bien, el defecto mental que anula la capacidad suficiente para comprender la criminalidad del acto o para conducirse de acuerdo con la ley es una causa de inimputabilidad, ya que suprime el elemento mental. Art. 30 del Código Penal, 33 L.P.R.A. sec. 3152. Esa carencia de capacidad no tiene que ser total o completa, pero sí de tal grado que impida a la persona conducirse conforme con la ley o comprender la criminalidad de sus actos. Nótese que nuestro Art. 30 del Código Penal, *supra*, es una traducción de la Sec. 4.01 del Código Penal Modelo, por lo que la interpretación dada a ese código es importante en la interpretación de nuestro estatuto. Véase D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, págs. 63–66. Se advertirá, además, que el defecto mental incapacitante puede ser aquel que ocasione una deficiencia a nivel cognoscitivo-intelectual o a nivel volitivo.

▮▮▮ Bajo la definición del Código Penal Modelo, el término "defecto mental" incluye la retardación mental.[13] Véase American Law Institute, *Model Penal Code and Commentaries*, AMA, 1985, Sec. 4.01, págs. 176–177.

▮▮▮ La retardación mental "envuelve una significativa disminución de las funciones intelectuales ocurridas *antes*

---

[13] La retadación mental u oligofrenia se define como poca inteligencia o deficiencia mental. Véase *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 976. El diagnóstico de esta condición se hace independientemente de que coexistan otros desórdenes físicos o mentales. DSM III, pág. 36.

En *McDonald v. United States*, 312 F.2d 847, 851 (Cir. D.C. 1962), se definió la enfermedad o defecto mental como

"...any abnormal condition of the mind which *substantially affects mental* or emotional *processes* and *substantially impairs behavior controls.*" (Énfasis suplido.)

La retardación mental puede ser de tal gravedad que afecte sustancialmente el proceso mental (inteligencia) y disminuya sustancialmente los controles de la conducta.

*de cumplir los dieciocho (18) años".* J.E. Granados Peña, *Las defensas derivadas de la insanidad mental: ¿Dónde está Puerto Rico?,* 53 Rev. C. Abo. P.R. 47, 61 (1992); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorder,* Third Edition (DSM III); Washington, DC, APA, 1980, págs. 36–41. Conforme al DSM III, se aceptan distintos grados de severidad de la retardación mental fundado en los distintos cocientes de inteligencia (I.Q.) que reflejan las pruebas sicométricas realizadas por los sicólogos, a saber, media (50–55 a 70); moderada (35–40 a 50–55); severa (20–25 a 35–40), y profunda (hasta 20 ó 25).[14] Granados Peña, *supra,* pág. 61.

 Esa deficiencia significativa de las funciones intelectuales generalmente resulta en deficiencia o impedimento en la conducta adaptativa al ambiente social que rodea al individuo que padece de retardación mental. La efectividad con que el individuo se adapta a las reglas de independencia personal y responsabilidad social que se esperan a su edad y en su grupo cultural se ve afectada por tal deficiencia a nivel intelectual. Véase DSM III, pág. 37.[15] Para la psiquiatría, entre la adaptación social y la inteligencia existe una relación directa que disminuye a medida que disminuye la severidad del defecto mental. DSM III, pág. 37.

La pregunta de rigor es, pues, ¿son todos los retardados mentales inimputables de delito por carecer de capacidad mental?

---

[14] Generalmente, las funciones intelectuales se miden con las pruebas sicométricas y se le da un cociente de inteligencia (I.Q.) conforme con el resultado de los exámenes de inteligencia de dichas pruebas. Una disminución significativa de estas funciones está reflejada por un I.Q. de 70 o menos con un margen de error de ±5 puntos. Por ello la frontera se traza en una puntuación entre 65 a 75. El individuo normal tiene un promedio de 100 a 90.

[15] De hecho, el I.Q. de 70 a 75 se utiliza como frontera, pues se ha comprobado que los que están por debajo del mismo generalmente tienen una pobre función de adaptación a dichas normas y requieren unos servicios de protección especiales. DSM III, pág. 37.

La profesora Nevares-Muñiz señala al respecto:

*En el Código Penal Modelo, (draft No. 4, apéndice c) se exponen los memoriales del consultor, Dr. Manfred Guttmacher, explicando el criterio de inimputabilidad por incapacidad mental que se incluye en ese código. Según el siquiatra, en casos de retardación mental sólo estarán exentas las personas que tengan extrema retardación. Puede haber situaciones en que personas aún con defectos mentales puedan tener capacidad suficiente para funcionar bajo condiciones normales.* (Énfasis suplido.) Nevares-Muñiz, *op. cit.*, pág. 65.

■ El profesor Granados Peña llega a una conclusión similar. En su citado artículo se plantea la controversia y expone:

Naturalmente cuando se presenta una situación de retardación mental puede plantearse como defensa el defecto mental, *siempre y cuando el grado de retraso sea suficiente para evitar la adecuada relación intelectivo-volitiva.* Empero, ¿debe declararse la inimputabilidad siempre? *No hay duda que ello es así en la profunda y la severa. La discusión se centra en la moderada y media. Comparto la opinión de que en esas situaciones, el factor predominante para la determinación de la imputabilidad no es el psicológico puro sino una relación de factibilidad en la vida social de parte de quienes padecen dicho retraso. En todo caso lo importante es definir si al momento del acto, ese sujeto podía actuar de otra manera o si lo hizo en virtud de no estar en posición de comprender los alcances antijurídicos de su obrar.* (Énfasis suplido y escolios omitidos.) Granados Peña, *supra*, págs. 61–62.

■ De suerte que cuando de retardación moderada (35–40 a 50–55) o media (50–55 a 70–75) se trata, habrá que recurrir a los hechos para determinar si la conducta adaptativa del acusado, antes y durante los hechos, demuestra que éste podía actuar de otra manera o si incurrió en el delito en virtud de no comprender los alcances antijurídicos de su obrar. *Cf. McDonald v. United States*, 312 F.2d 847, 850 (Cir. D.C. 1962) (la sola evidencia de un I.Q. de 68 es insuficiente para declarar inimputable al acusado); *Hill v. State*, 251 N.E.2d 429, 435 (1969) (la sola evi-

dencia de un I.Q. de 75 no denota un defecto mental de tal naturaleza que exima al acusado de responsabilidad).

Por otro lado, en términos procesales hemos establecido que la cordura del acusado se presume y que, para rebatir esa presunción, es necesario que éste presente prueba suficiente o que surja de la prueba de cargo una duda razonable sobre su cordura al momento de los hechos. Una vez surge esa duda razonable, le corresponde al Fiscal probar entonces la sanidad mental del acusado como cualquier otro elemento del delito. *Pueblo v. Marcano Pérez*, 116 D.P.R. 917, 927 (1986), y casos allí citados. El Ministerio Público no está obligado a presentar prueba pericial para probar la cordura del acusado o para refutar la prueba pericial de la defensa sobre insanidad mental. Le basta con presentar prueba, sea o no pericial, o una combinación de ambas, que demuestre más allá de duda razonable tal cordura.

## V

En el caso de autos, a poco se profundice, se nota que la defensa no presentó prueba suficiente para rebatir la presunción de cordura. Su perito (doctora Pinto) estableció que el acusado tenía un cociente de inteligencia de 66. Esto es una retardación mental media que, de por sí sola, no hace inimputable al apelante. Por otro lado, la prueba de cargo dejó establecido que el apelante se comportaba como un adulto y que comprendía la criminalidad de sus actos al momento de cometer los hechos. Todos los niños declararon que su padre se ocultaba de las demás personas al cometer los actos imputados; ya fuera cerrando las puertas o esperando a que la madre no estuviera en el hogar para satisfacer sus deseos sexuales. La propia doctora Pinto no pudo explicar ese proceder de una persona que calificó como retardada mental.

De otro lado, los propios testigos de reputación del apelante señalaron que éste era una persona funcional en su comunidad. En específico, lo describieron como persona respetuosa aunque tímida; que realizaba bien los distintos trabajos que se le encomendaban; que asumía fielmente la responsabilidad de velar los niños de esos testigos; en fin, que su adaptación social era la de una persona adulta, cuya edad cronológica era de cuarenta y dos (42) años.

Concluimos, pues, que el apelante era imputable al momento de cometer los hechos y que no erró el foro de instancia al así determinarlo.

## VI

◼ Finalmente, cuestiona el apelante la suficiencia de la prueba.[16] Corresponde al Ministerio Público probar todos los elementos constitutivos del delito imputado y su relación con el acusado, más allá de duda razonable, mediante prueba suficiente en derecho. *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748 (1985).

◼ Analizada la prueba en autos, concluimos que el Ministerio Público cumplió con ese deber. El apelante fue acusado por alegadamente cometer actos lascivos e impúdicos contra cuatro (4) de sus hijos. Todos los niños eran menores de catorce (14) años. El Art. 105 del Código Penal, 33 L.P.R.A. sec. 4067, penaliza por ese delito a toda persona que, sin intentar consumar el acto sexual, cometa cualquier acto que tienda a despertar, excitar o satisfacer su impudicia, pasión o deseos sexuales con otra persona. Este es un delito intencional.

La prueba de cargo dejó demostrado que el apelante, intencionalmente, sometió a los niños a diversos actos sexuales con el fin de satisfacer sus impulsos sexuales. Los

---

[16] Discutiremos conjuntamente con este señalamiento de error la alegación del apelante que cuestiona la denegación de la moción de absolución perentoria.

testimonios de los niños fueron explícitos en cuanto a los actos de contacto carnal con las partes pudendas de éstos y, en ocasiones, con los del apelante.

Esos testimonios fueron corroborados por la terapista doctora González de Knudson. Resulta revelador que ésta sometiera a los niños a una especie de confrontación extrajudicial de las versiones que éstos ofrecían y resultara que tales versiones eran consistentes entre sí. Además, para dar mayor confiabilidad al relato, los niños parecían vivir el mismo al momento de exponerlo a la perito.

Creída, como fue, por el foro de instancia esa prueba, es suficiente para sostener las convicciones del apelante. Su teoría de que todos los testimonios de los niños fueron fabricados por la madre en una clandestina trama amorosa para sacarlo de su casa se desvanece ante la contundencia y consistencia de los mismos. No intervendremos, pues, con la adjudicación de credibilidad y con la evaluación de la prueba hecha por el foro sentenciador. *Pueblo v. Rivera Robles*, 121 D.P.R. 858 (1988).

*Se dictará sentencia de conformidad.*