*1032 TEXTO COMPLETO DE LA SENTENCIA
I
Introducción
En el presente recurso, se plantea la cuestión de si existe un conflicto de interés que amerita la celebración de un nuevo juicio cuando, en un proceso criminal, la evidencia desfilada contra el acusado tiende a establecer la comisión de actos delictivos y/o antiéticos por el abogado que lo representa. Concluimos que en este tipo de situación, se vulnera la garantía a la asistencia de abogado consagrada en la Sección 11 del Art. II de la Constitución de Puerto Rico y la Sexta Enmienda a la Constitución de los Estados Unidos.
El presente recurso está relacionado a hechos ocurridos, el 13 de marzo de 1994, entre los municipios de Gurabo, Caguas y Cayey, en los que resultaron muertos cuatro (4) ciudadanos, y que fueron posteriormente denominados por la prensa local como la "Masacre de Cayey".
El apelante, Edgar Calderón Hernández, fue acusado ante el Tribunal de Primera Instancia, Sala Superior de Caguas, con relación a las muertes antes mencionadas, por cuatro (4) cargos de asesinato en primer grado, 33 L. P.R.A. sees. 4001 y 4002 (Supl. 2000); tres (3) cargos de secuestro agravado, 33 L.P.R.A. sec. 4178a (Supl. 2000); una infracción al art. 15 de la Ley de Protección Vehicular, por comercio ilegal de vehículos, 9 L.P.R.A. see. 3214; tres cargos por violación al art. 6A de la Ley de Armas de Puerto Rico, por posesión de varias armas de fuego, 24 L.P.R.A. see. 416a y dos (2) cargos, cada uno, por violación a los siguientes otros artículos de la Ley de Armas: 5 (posesión ilegal armas automáticas), 24 L.P.R.A. see. 416; 6 (posesión de arma de fuego sin licencia), 24 L.P.R.A. see. 416; 8 (portación de armas cargadas), 24 L.P.R.A. see. 418, y 8A (portación agravada), 24 L.P.R.A. sec. 418a.
Luego de un extenso juicio por jurado celebrado entre septiembre de 1996 y febrero de 1997, el apelante fue hallado culpable por los cargos de asesinato, secuestro agravado, art. 15 de la Ley de Protección Vehicular, los cargos por violación al art. 6 y 6A de la Ley de Armas y uno de los cargos por infracción al art. 8 de la Ley de Armas. El 3 de marzo de 1997, fue condenado a cumplir cuatro (4) sentencias consecutivas de 99 años por los asesinatos, además de numerosas otras penas concurrentes con relación a los demás delitos.
Durante el juicio, el apelante estuvo representado por el Ledo. Ramón Delgado Rodríguez, habiéndose opuesto el Ministerio Público, representado por Mayra López Mulero, a que se unieran a su representación otros abogados que representaban personas acusadas por los mismos hechos, por razones de conflicto de interés. 
Entre numerosos otros testigos, el Ministerio Público presentó el testimonio de César Escobar Vázquez. Dicho testigo fue anunciado, el 12 de septiembre de 1996, durante el proceso de selección de jurado en el caso. Declaró como último testigo del Pueblo en febrero de 1997, luego de varios meses de juicio en que el apelante estuvo representado exclusivamente por el Ledo. Delgado.
Entre otras cosas, el Sr. Escobar declaró sobre cierta conducta delictiva del apelante relacionada al trasiego de drogas en Puerto Rico, no incluida en los cargos que se estaban ventilando en contra de éste. Su declaración incluia la afirmación de que el Ledo. Delgado había participado en algunas de estas transacciones, haciendo pagos ilegales por substancias controladas. También declaró que el apelante supuestamente le había comentado que el Ledo. Delgado tenía conexiones con las autoridades y podía hacer "desaparecer" evidencia en su contra.
El apelante objetó esta prueba y, al ser admitida la misma, solicitó la disolución del jurado. Estos planteamientos fueron denegados por el Tribunal de Primera Instancia. El apelante recurrió ante este Tribunal sobre este asunto mediante dos recursos, casos KLCE-97-00089 y KLCE-97-00107. El primero de éstos fue denegado por motivos procesales, el 5 de febrero de 1997.
*1033 El caso KLCE-97-00107, relacionado a la negativa del Tribunal de Primera Instancia a disolver el jurado, fue denegado mediante decisión dividida del Panel, en atención a lo adelantado del proceso y para permitir que el juicio pudiese completarse. En aquella ocasión, no obstante, observamos que los planteamientos del apelante no carecían de sustancia. 
En el presente recurso, el apelante ha renovado su planteamiento. El 3 de junio de 1997, ordenamos al Procurador General someter un alegato relacionado a la admisión del testimonio del Sr. Escobar. Dicha parte recurrió al Tribunal Supremo de Puerto Rico, el cual, mediante opinión emitida el 29 de mayo de 1998 en el caso Pueblo v. Calderón Hernández, 145 D.P.R. _ (1998), 98 J.T.S. 66, ordenó la reproducción de la totalidad del récord y la evaluación integral de todos los señalamientos levantados por el apelante.
La transcripción de la prueba fue presentada por el apelante, el 3 de diciembre de 1999. Dicha parte presentó su alegato, el 20 de enero de 2000. El Ministerio Público presentó su alegato, el 5 de julio de 2000, quedando el asunto sometido para nuestra resolución.
Si bien nuestra decisión descansa principalmente en el incidente procesal mencionado, siguiendo el mandato del Tribunal Supremo de Puerto Rico, procedemos a hacer una exposición completa del caso y discutir todos los planteamientos levantados por el apelante.
II
Hechos
1. La Banda de "Negri”
Los hechos por los que fue acusado el apelante, surgen de la prueba presentada por el Ministerio Público durante el juicio. Los mismos están relacionados a una banda de narcotraficantes que operaba en el Residencial Gautier Benitez, en la ciudad de Caguas, dirigida por Exel Torres Gómez, alias "Negri". Al apelante, conocido bajo el apodo "Prieto Capota", se le consideraba uno de los principales lugartenientes de Negri.
Para la fecha en cuestión, existía una rencilla entre Negri y un individuo de nombre Angel Luis Castro Alifonso, quien también estaba envuelto en actividades delictivas. Castro Alifonso residía en Gurabo.
De acuerdo al testimonio de Jesús M. Carrasquillo, uno de los testigos que declaró que era ex-usuario de drogas y amigo personal del Sr. Castro Alifonso, aproximadamente un mes y medio antes del día de los hechos, Castro Alifonso había participado, junto con otra persona, en un "tumbe" de seis o siete millones de dólares, que le habían sido robados a un mafioso de Patillas. Carrasquillo no participó en el robo.
Luego del robo, el estilo de vida de Castro Alifonso cambió dramáticamente. Compró tres "corvetas", un "BMW', dos motoras, una casa, una finca, prendas, etc. Entre las prendas mencionadas, estaba una cadena de cuello de oro "bien gorda". Carrasquillo, quien también residía en Gurabo, se benefició con los regalos que le hizo su amigo. En una ocasión, según el testigo, se fueron de jueves a domingo al Holiday Inn de Ponce. Castro Alifonso pagó por todos los gastos.
Aparentemente, el dinero robado pertenecía, en todo o en parte, a Negri. Dada la forma extraordinaria en que Castro Alifonso estaba gastando dinero, en fecha tan próxima al robo, Negri sospechó que él había sido el que lo había robado y comenzó a hacer planes, junto con sus secuaces, para vengarse.
2. Los hechos de Gurabo
A principios de marzo de 1994, Castro Alifonso estaba en negociaciones con el Sr. Carlos Ortiz Feliciano, *1034 quien residía en las Parcelas Jauca en el Municipio de Santa Isabel, para comprarle la casa a éste. Castro Alifonso había ido a casa del Sr. Ortiz en compañía de José Manuel Alamo Díaz, alias "Coco", quien se dedicaba a lavar carros y que solía acompañar a Castro Alifonso en sus gestiones de negocio.
El día de los hechos, 13 de marzo de 1994, Castro Alifonso fue a casa del Sr. Ortiz en compañía de Coco para completar el negocio. Castro Alifonso pagó por la casa en efectivo. El Sr. Ortiz se marchó con ellos para otorgar las escrituras. Los acompañó un joven vecino llamado Edison Marrero Vázquez. Se fueron en un vehículo Mustang rojo "cinco litros" que pertenecía a Castro Alifonso. 
El grupo fue a casa del Ledo. José Luis Velazquez Ruiz en el municipio de Gurabo, donde procedieron a otorgar la escritura de la compraventa. Luego de eso, se marcharon. Eran cerca de las 3:00 p.m.
Luego de otorgar la escritura, el grupo llegó al frente de la casa de Carrasquillo, en el sector Villa Alegre de Gurabo. Coco estaba al volante del Mustang y lo estacionó en la acera frente a la casa. Castro Alifonso se bajó del vehículo y llamó a una vecina de Carrasquillo, María del Carmen Barbosa, a quien le decían "la Nena". Al escuchar su nombre, la "Nena" salió de la casa.
En ese momento, llegó un Toyota blanco que se estacionó frente al carro de Castro Alifonso. Inmediatamente después, llegó un Honda Prelude rojo que se detuvo detrás del vehículo de Castro Alifonso. De este vehículo se bajó un individuo que tenía puesta una careta de tela azul y que tenía un arma larga (AK-47) en las manos. El individuo le gritó a Castro Alifonso "Cabrón, párate ahí." Del automóvil blanco se bajaron otras dos personas enmascaradas que también estaban armadas.
Castro Alifonso echó a correr por la calle y el individuo de la careta azul le disparó, alcanzándolo. Castro Alifonso cayó al pavimento. El individuo se le acercó y se quitó la careta, diciéndole "Cabrón, coge tumbe para que veas quién soy." Era el apelante.
El apelante le disparó varias veces a Castro Alifonso en el piso, dándole muerte. Los otros dos individuos sacaron a la fuerza a los pasajeros del automóvil de Castro Alifonso y los montaron en el Prelude, halándolos por el pelo y dándoles golpes por la cabeza con las armas. Les decían que los iban a matar. La "Nena" estaba gritando, pero uno de los pistoleros le dijo que se callara que a ella no la iban a matar.
Luego partió el Toyota blanco, seguido por el Honda Prelude y el Mustang, que era conducido por el apelante. El apelante dejó la careta azul tirada en el pavimento, cerca del cuerpo de Castro Alifonso.
Luego de que los asesinos se marcharan, Carrasquillo salió de su casa y cubrió la cara de Castro Alifonso con un paño negro.
El episodio fue observado por Carrasquillo, por la Nena y por un vecino de ellos, Juan Concepción González, a quien le apodaban el "Luchador" y que residía frente al lugar donde había caído Castro Alifonso. También fue observado de lejos por José Orta Hernández, un agente del Orden Público que estaba en su casa empañetando una escalera y que subió a la parte alta de la misma luego de escuchar los disparos. El Sr. Orta vio cuando los acompañantes de Castro Alifonso eran golpeados para montarlos en el Honda Prelude, aunque, aparentemente, estaba muy lejos para distinguir a las personas envueltas.
Posteriormente, la Nena se marchó de Puerto Rico. Concepción González cooperó en la investigación del caso, identificando al apelante como el autor del asesinato; pero posteriormente se retractó, siendo traído a declarar durante el juicio como un testigo hostil por el Ministerio Público. En el juicio, González negó que alguno de los pistoleros que dieron muerte a Castro Alifonso se hubiera quitado la careta, expresando que había identificado al apelante como el autor del delito porque los policías lo habían coaccionado.
*1035 3. Los hechos de Caguas
Para la fecha de los hechos, Luis Colón Méndez vendía marihuana para unos de los asociados a la banda de Negri, Miguel Rivera Newton, conocido como "Cano Newton". Ese día, Colón Méndez estaba vendiendo droga en un punto localizado en el estacionamiento del edificio 45 en el Residencial Gautier Benitez en Caguas, que también quedaba contiguo a los edificios núm. 5 y 46 del residencial. El estacionamiento tenía una cadena que Colón Méndez ponía y quitaba.
En horas de la matana, llegó Cano Newton en un vehículo Oldsmobile nuevo color vino de dos puertas, que estacionó al lado de un Honda Prelude rojo robado que estaba en el estacionamiento desde el día anterior. Luego llegó Negri en una guaguita color crema.
Colón Méndez vio cuando Negri fue a hablar con otro de los miembros de la banda, llamado Héctor Ayala Adorno, que le decían "Cano Camry". Cano Camry sacó dos AK-47 del baúl del Honda. Luego llegó otro asociado, Antonio Rodríguez Arguelles, alias "Tony", quien le dijo que había problemas y que se "recogiera". La gente del residencial se encerró en sus apartamentos.
Además de los mencionados, estaban otras personas de la banda: Angel Luis Cotto, alias "Peseta", Angel D. Rodríguez Rivera, conocido como "Chungo", Luis Rivera Newton, alias "Luis el mono", y otros dos identificados como "Eli el Sapo” y "Cheo el gallero". Al rato, varias de las personas se montaron en la guagua crema y el Prelude rojo y se fueron. Colón Méndez se quedó en el punto vendiendo drogas.
La actividad fue observada por el Sr. William del Valle y su esposa María Berrios quienes vivían en el primer piso del edificio núm. 46 del residencial, al lado del estacionamiento. Del Valle tenía récord criminal por infracciones a la Ley de Armas.
Más tarde, el día de los hechos, entre las 3:30 y las 4:00 p.m., la Sra. Nilda Díaz Rodríguez se encontraba en el Residencial Gautier Benitez de Caguas. Para esa fecha, la Sra. Díaz Rodríguez se desempeñaba como confidente de la Policía. Vivía en otra urbanización de Caguas, pero había ido al residencial para pagarle un dinero que le debía a una persona. Esta no estaba, por lo que fue a buscarla al edificio núm. 43. Se encontró con la Sra. Matilda Hernández quien le dijo que se fuera del residencial porque "algo iba a ocurrir".
La Sra. Díaz Rodríguez acompañó a Matilda al apartamento de la nieta de ésta, Milagros Figueroa, situado al lado del estacionamiento que quedaba entre los edificios 45 y 46. Cerraron las ventanas y llevaron a las dos niñas pequeñas de Milagros a la parte de atrás de la casa, para protegerlas. Matilda se fue. La Sra. Díaz Rodríguez se trepó en una silla y miró por una rendija que dejó abierta en la ventana.
En su apartamento en el edificio núm. 46, los esposos William del Valle y María Berrios también habían cerrado sus ventanas y estaban mirando por las rendijas.
Al rato, llegaron los tres vehículos. Colón Méndez quitó la cadena para dejarlos pasar. Estaban el apelante, Chungo, Luis el Mono, y Cano Camry. Luego salieron los otros de la banda, incluyendo a Negri y los demás mencionados, Luis Rosado Jiménez, alias "Hulk", Edwin López Colón, alias "Fish", dos individuos conocidos como "Aluminio" y "Ricky el gringuito" y posiblemente otros. Había como veinte (20) personas en el estacionamiento. Varios de los miembros de la banda estaban armados. El apelante tenía un arma larga. Otros tenían pistolas. Cuando llegaron, Tony le dijo a Colón Méndez que se fuera.
Los testigos vieron cómo los de la banda bajaron a tres individuos del Prelude rojo. Uno de ellos era "blanco, bajito, con pelo castaño y medio llenito." El apelante y Cano Camry lo sacaron del automóvil. Lo pillaron contra el lado del baúl.
*1036 Otro era "alto, trigueño, con afro y delgado". Chungo le daba puños y lo bajó del carro. Los participantes golpeaban a las víctimas. Les daban puños, patadas, con un palo y con las armas. Las víctimas estaban desfiguradas. Gritaban que no los mataran, que ellos no sabían nada. Se los llevaron de lugar. Luego los trajeron de vuelta. Tenían las caras ensangrentadas y casi no podían caminar.
Negri les gritó "¿Dónde están los chavos, canto de cabrones? ... ¿Dónde están los chavos o los quemamos ahora mismo aquí o los quemo vivos ahora mismo?"
Negri le ordenó a Tony que trajera un galón de gasolina. Tony y Richy, el gringuito, trajeron la gasolina. Pusieron a las víctimas en fila y las obligaron a tomar.
Cerca de las 6:00 p.m., llegó al lugar Edgar Piñero, un adicto que compraba drogas en el punto. Negri le dio doscientos dólares ($200.00) y cinco bolsas de heroína.
Piñero vio un automóvil Honda Prelude rojo en el que se encontraban tres personas. Tenían las manos ensangrentadas y amarradas con tape. En la parte trasera de la capota había un alicate. A Piñero le llamó la atención, porque no lo estaban utilizando para nada mecánico. Lo habían utilizado para arrancarle las uñas a las víctimas. Una de las víctimas tenía un embudo rojo pequeño en la boca. Vio que las personas estaban vivas porque una de ellas movió la cabeza.
Negri le pidió como favor que se llevara ei Honda con las víctimas hasta Cayey. Le ofreció tres mil dólares ($3,000.00). El le dijo que no podía hacerlo.
Poco después, se llevaron los vehículos. Eran entre las 6:00 y las 7:00 p.m.
Más tarde, esa noche, los miembros de la banda regresaron al residencial y se congregaron en el estacionamiento. La Sra. Berrios vio que el apelante le mostraba a los otros miembros de la banda una cadena grande de oro con una imagen de San Lázaro que le había quitado a una de las víctimas.
Después salió en las noticias que habían encontrado el Honda Prelude quemado en Cayey, con tres cuerpos adentro, por lo que los testigos infirieron que se trataba de las personas que habían visto eran torturadas por Negri y su banda.
A la fecha del juicio, los testigos mencionados recibían protección de la Policía.
4. Los hechos de Cayey
El día de los hechos, en horas de la tarde, el Sr. Misael Rivera Flores, quien residía en el Barrio Culebra de Cayey, cerca del Barrio Cedro de dicho municipio, vio un vehículo Honda Prelude rojo que subía bastante rápido por la carretera 738. El vehículo era conducido por una persona que tenía una T-Shirt blanca. Era seguido por un vehículo "pick-up" negro y otro color crema, el cual vio bajar minutos más tarde por la misma carretera.
Poco después, la Policía encontró los restos del Honda Prelude, así como los tres cadáveres. La escena del crimen fue investigada por el personal de la Policía, el cual recopiló evidencia física de los delitos.
Los cuerpos fueron llevados a Medicina Forense, donde la Dra. María Conti Miller les realizó las autopsias.
Examinó el cadáver de Edison Marrero. Encontró que por causa de las quemaduras, había perdido la mayoría de sus órganos. Sólo pudo identificar el pulmón izquierdo y el derecho. Identificó múltiples fracturas en la cabeza y la presencia de proyectiles. Le hizo un análisis toxicológico que resultó positivo para marihuana, *1037 codeína, morfina y metabolitos de cocaína.
Le practicó la autopsia a José Manuel Alamo Díaz ("Coco"). La causa de la muerte fue por heridas de balas en la cabeza (trauma cráneo cerebral). Se le encontró un proyectil en la cabeza. El cuerpo de la víctima estaba severamente quemado, pero un poco menos que el de Edison Marrero. Los órganos intemos estaban presentes. Dio positivo para cocaína y alcohol.
Examinó el cuerpo de Carlos Ortiz Feliciano. Este murió por trauma cráneo cerebral. Los huesos de su cráneo estaban totalmente destmidos. Tenía amputaciones por efectos de las quemaduras. Prácticamente todos los órganos internos se podían observar.
La Dra. Conti también realizó la autopsia de Angel Castro Alifonso. Este murió a causa de nueve (9) perforaciones de bala.
Las víctimas fueron identificadas por sus familiares o por sus récords dentales.
Durante el funeral de Castro Alifonso, se recibió una corona anónima que decía "Recuerdos de cinco litros". El personal de la funeraria removió el mensaje. Luego de consultarlo con los familiares, pusieron la corona en la capilla.
5. El Juicio contra el Apelante
Por los hechos antes mencionados, se presentaron denuncias contra diez (10) personas: el apelante, Exel Torres Gómez ("Negri"), Miguel Rivera Newton ("Cano Newton"), Héctor Ayala Adorno ("Cano Camry"), Roberto Cotto Maldonado ("Reseta"), Luis Rosado Jiménez ("Hulk"), Luis Rivera Newton ("Luis el mono"), Edwin López Colón ("Fish"), Angel D. Rodríguez Rivera ("Chungo") y Antonio Rodríguez Arguelles ("Tony"). 
Luego de otros trámites, el apelante fue acusado junto a Edwin López Colón, Luis Rivera Newton y Luis Rosado Jiménez. El proceso recibió una amplia cobertura por los medios noticiosos. Junto con su recurso, el apelante ha sometido una lista de cincuenta y tres (53) columnas publicadas entre el 1 de agosto de 1996 al 18 de febrero de 1997 por conocidos rotativos del país, que contienen detalles sobre la evidencia del Pueblo. 
Los artículos utizaban lenguaje inflamatorio, (por ejemplo: "Los Asesinatos de un Narcoterrorista"; "Narcotesoro deja Estela de Sangre"; "Fiera Hecha por el Poder y los Puntos de Droga"; "Negri Consolida Empresa Criminal"; "Negri se Deshace de toda Oposición"; "Negri Establece la Paz de los Muertos"; "Fusilado por Matar sin Permiso de Negri"; "Negri Deja Huérfanos a 9 Niños de 3 Hermanos"; "Balacean y Queman a 3 Inocentes").
Desde el principio, el apelante se quejó de la publicidad excesiva que estaba recibiendo el caso. Oportunamente, también solicitó que se le concediera un juicio separado al de los otros acusados, alegando conflicto de intereses entre ellos.
Luego de otros incidentes, el 7 de mayo de 1996, fecha en que estaba pautado a comenzar el juicio, el Tribunal de Primera Instancia ordenó la posposición del mismo, por motivo de la publicidad excesiva. En esa fecha, el distinguido foro de Instancia también concedió la separación del juicio del apelante, según solicitado por éste. Esta determinación fue sostenida por este Tribunal, Pueblo v. Calderón Hernández, KLCE-00-00550 (sentencia del 23 de julio de 1996), y por el Tribunal Supremo de Puerto Rico, caso CC96-91 (resolución del 12 de agosto de 1996).
El proceso de selección de jurado comenzó en agosto de 1996 y se extendió por varias semanas.
*1038 A comienzo del proceso, el apelante solicitó una nueva posposición del juicio, por razón de la publicidad excesiva, lo que fue denegado por el Tribunal.
El apelante también solicitó en ese momento unir a su representación en el caso a los Ledos. Héctor Castro Pérez y Miguel Cordero. El Ledo. Castro Pérez representaba a otro de los co-acusados ("Fish"), cuyo juicio había sido separado del juicio del apelante. El Ledo. Cordero estaba asociado con otro de los abogados de dichos co-acusados.
El Ministerio Público se opuso a la participación de estos abogados, aduciendo que el propio apelante había señalado la existencia de conflictos entre él y los otros co-acusados. El Tribunal de Primera Instancia denegó la inclusión de los nuevos abogados. Esta determinación fue posteriormente reducida a escrito por el foro de Primera Instancia, recurrida por el apelante, y sostenida por este Tribunal, caso KLCE-97-00053 (resolución del 22 de enero de 1997).
El 12 de septiembre de 1996, durante el proceso de selección del jurado, el Ministerio Público anunció que estaría presentando el testimonio de César Escobar Vázquez, con relación a ciertas admisiones hechas por el apelante. El récord refleja que la Fiscal López Mulero había obtenido una declaración jurada de dicho testigo pocos días antes, el 6 de septiembre de 1996, en la que éste imputaba al abogado del apelante haber participado en actividades delictivas y conducta impropia. Aunque el Ministerio Público ofreció un resumen general de las admisiones que el apelante supuestamente había hecho al testigo, la información de que se había mencionado a su abogado, no fue notificada por el Estado, ni se advirtió al Tribunal sobre esta situación.
Así las cosas, el desfile de prueba comenzó el 7 de octubre de 1996. El mismo se extendió por varios meses. El Ministerio Público presentó el testimonio de sobre treinta (30) testigos, quienes declararon sobre los hechos expresados anteriormente.
Durante el proceso de desfile de prueba, el Juez que presidía el caso intervino activamente haciendo preguntas en numerosas ocasiones e impartiendo diversas instrucciones al jurado. El apelante objetó esta conducta.
6. El testimonio de César Escobar Vázquez
El 5 de febrero de 1997, luego de varios meses de vista, el Ministerio Público trajo a declarar al Sr. Escobar Vázquez. El apelante objetó la inclusión de este testimonio, por lo que el Tribunal precedió a celebrar una vista en ausencia del jurado para determinar admisibilidad bajo la Regla 9 de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 9. Escuchada la prueba, el Tribunal permitió que la misma fuera traída ante la consideración del jurado.
Por la importancia que reviste dicho testimonio para el presente recurso, procedemos a describir su contenido en su totalidad, adoptando el resumen ofrecido en el informe del Ministerio Público y suplementando el mismo con algunos pasajes de la transcripción:
El señor César Escobar Vázquez, de origen colombiano, declaró que actualmente se encuentra preso en la cárcel federal de Guaynabo debido a que fue sentenciado por el delito de conspiración de drogas a una pena de cuarenta y ocho (48) meses por tres cargos de conspiración para distribuir sustancias controladas. Se le impuso esa sentencia porque el gobierno federal le concedió una inmunidad parcial a cambio de su cooperación. A cambio de esa inmunidad parcial, su obligación era declarar la verdad sobre todos los crímenes que había cometido en Puerto Rico relacionados con la venta de drogas. Como parte de estos procedimientos fue entrevistado por varios agentes. En una de estas entrevistas, mencionó el nombre del apelante Prieto Capota y el Agente le preguntó que qué sabía sobre esta persona. Le dijo a este agente lo que sabía en relación a Prieto Capota y, posteriormente, se comunicaron con la fiscal del caso.
Manifestó el testigo que conoció al apelante en relación a las transacciones de drogas que vino a hacer en Puerto Rico a finales de enero de 1994. En esa ocasión se reunió con un individuo de nombre Melvin que lo fue a *1039 recoger a un hotel en Isla Verde en compañía de Prieto Capota. Al salir del hotel hacia Caguas, primero se detuvieron a comer en un restaurante donde comenzaron a negociar. El apelante le preguntó entonces si conocía a Negri, al responderle que no, el apelante le dijo que lo llevaría a Caguas para ver los puntos que él tenía, ya que había obtenido autorización de Negri para que él trabajara en la venta de heroína. Fueron a Caguas en compañía de Melvin y un individuo llamado Carlos; fueron al Residencial Gautier Benitez.
Añadió que Melvin le había comentado que se tenía que ir de Puerto Rico, ya que tenía problemas, por lo que Prieto Capota se haría cargo del negocio. Al llegar a Caguas, recorrieron el caserío Gautier Benitez y el testigo declaró lo que vio allí en cuanto al lugar de estacionamiento donde se llevaban a cabo las transacciones. Luego de esto, partió nuevamente hacia Isla Verde. Al día siguiente, recibió una llamada de Prieto Capota, quien le preguntó que cuándo iba a recibir heroína. El testigo le indicó que en pocos días iba a llegar un muchacho colombiano que traía unos tres (3) kilos de heroína. Una semana o dos después de esto, llegó el colombiano, pero tuvieron un problema y se le entregó la heroína a otras personas, por lo que no se le pudo hacer la entrega a Prieto. Continuó declarando que semana y media después llegó el colombiano llamado Luis con medio (1/2) kilo de heroína y debido a que Prieto tenía una deuda con Carlos, fueron ambos hacia Caguas. La deuda era por una heroína que había comprado y que todavía Prieto le adeudaba unos nueve mil ($9,000.00) dólares. En Caguas se reunieron con Prieto, quien le pagó a Carlos la deuda y el testigo le indicó que tenía la heroína en el hotel. Entonces Prieto mandó a buscar el dinero y les entregó una bolsa grande. El testigo pensó que todos eran billetes de a dólar porque se sorprendió de que la bolsa fuera tan grande. Cogieron la bolsa y se fueron.
Continuó declarando que en la autopista, debido a que no tenía dinero a mano, no tenía billetes pequeños, fue a buscar dentro de la bolsa para pagar el peaje. Entonces se percató que se trataba de billetes de cien ($100.00) dólares cada uno. Por lo que se percató que se trataba de una equivocación y esperó a que Prieto lo llamara. Poco después recibió un mensaje por "beeper" de Prieto, quien le preguntaba dónde estaba. El le contestó que estaba cerca y que activara el teléfono celular. Al activar el teléfono, Prieto lo llamó indicándole que no se moviera de ahí. El testigo le indicó que no había problema, que él tenía el dinero, que llegara hacia donde él se encontraba. Cinco (5) minutos más tarde apareció Prieto Capota, en compañía de un muchacho llamado Richie y dos personas más. Todos andaban en motocicletas y estaban armados.
Manifestó el declarante que fueron nuevamente a Gautier Benitez y al hablar se percataron de que Prieto Capota le había dado ciento diez mil ($110,000.00) dólares pensando que se trataba de un (1) kilo de heroína. Entonces el testigo le dijo: "no lo que yo tengo es medio (1/2) kilo y esa fue la equivocación." Aclara que la equivocación que surgió entre ellos fue que cuando Prieto les paga, le está pagando por un (1) kilo de heroína mientras ellos pensaban que lo que estaba haciendo Prieto era satisfaciendo la deuda de nueve mil ($9,000.00) dólares que tenía con Carlos. Aclarada la situación, se sacó el dinero por la cantidad de heroína que se iba a comprar; o sea, unos sesenta ($60,000.00) mil dólares. El testigo se fue con Richie, mientras Prieto les indicó que los seguiría.
Continuó declarando que se dirigieron al hotel y Prieto los seguía hasta que llegaron a la Avenida Ponce de León, a un negocio denominado Padrinito, donde el testigo se quedó con Prieto y enviaron a Luis, Lucho y a Richie a que buscaran el medio (1/2) kilo de heroína. Mientras permanecieron en el negocio, Prieto le indicó que él tenía dinero para invertir, que él le podía poner dinero para invertir en un (1) kilo de heroína y continuaron negociando. Al bajar los individuos con la heroína, él les dijo que se fueran para que no anclaran con esa mercancía por ahí.
Añadió el testigo Escobar Vázquez que ese mismo día el colombiano se fue para Nueva York con el dinero y quedó en regresar en una semana o semana y media. Cuando regresó, el testigo se comunicó con Prieto Capota a través del "beeper", indicándole que tenían el medio (1/2) kilo de heroína y que llegarían hasta Caguas. Fueron hasta Caguas, pero no llevaron la mercancía completa, sólo una muestra. Esto es una costumbre para probar la calidad de la mercancía. Una vez hecho el procedimiento para probar la calidad, permanecieron allí unos cuarenta y cinco (45) minutos y entonces Prieto les dijo que se fueran, que él les llevaría el dinero al hotel. A las siete u ocho de la noche, Prieto bajó hasta el hotel en Miramar y les trajo el dinero. Luego de esto, se efectuó otra *1040 transacción que fue la última que se efectuó en el Hotel Pierre en la Avenida De Diego de Santurce. Aclaró que se estaba quedando en el Hotel Pierre, pero la transacción se hizo en Miramar ya que se utilizaban diferentes hoteles y sólo usaban el de Miramar para hacer las transacciones. Manifestó que llegó al hotel en Miramar y Prieto Capota llegó acompañado de Richie, en un Honda Accord marrón y le pidió que le ayudara a subir la droga que estaba en una caja. Aclaró que el dinero era el que estaba en la caja. Manifiesta que, en esta ocasión, la droga no se encontraba en cápsulas, sino que estaba en lo que se conoce como libretas. Luego de unas transacciones preliminares, Prieto le entregó cincuenta mil ($50,000.00) dólares, quedando a deber sesenta mil ($60,000.00), los cuales serían entregados el próximo lunes.
Continuó declarando que el próximo lunes llamó a Prieto Capota y éste fue hasta el hotel en Miramar y le dijo que la droga no estaba muy buena. Entonces el testigo le dijo que le devolviera la droga que él devolvía los cincuenta mil ($50,000.00) dólares. Prieto le manifestó que porqué él no le ayudaba a prepararla, a "cortarla" que es como se conoce este procedimiento. Accedió a la proposición de Prieto, quien quedó en irlo a buscar esa misma noche, pero no fue. Lo llamó el martes y tampoco le contestó. El martes en la noche, mientras veía televisión, se enteró de que lo habían arrestado. En el reportaje se enteró de que lo habían arrestado en la madrugada y vio el bulto que él le había dado para subir la caja al hotel, indicándole que no andaran con el dinero en una caja, que mejor era llevar un bulto, que cualquiera podía pensar que era ropa. Pudo también observar un kilo de drogas, de la heroína que le había entregado días antes.
Manifestó Escobar Vázquez que inmediatamente se fueron del hotel pensando que ellos podían ser los próximos en ser arrestados. Llamó por teléfono a Richie y éste le indicó que Prieto Capota aún no había salido. Al día siguiente volvió a llamar a la mamá de Richie, quien le indicó que ya Prieto estaba fuera. Logró hablar con Prieto y quedaron en reunirse. Se reunieron en Isla Verde donde Prieto Capota llegó acompañado por un individuo llamado Peseta. Fueron hasta el auto donde Prieto Capota le entregó dos mil quinientos ($2,500.00) dólares y quedó en que le iba a conseguir más dinero.
Señaló que tres (3) semanas más tarde, Prieto Capota le indicó que tenía unos diez mil ($10,000.00) dólares, por lo que podía pasar por Caguas a recogerlo. Fue a un centro comercial en Caguas donde llamó a Prieto a casa de su suegra. Este le indicó que lo esperara durante unos quince o veinte minutos en lo que él llegaba. Prieto llegó acompañado de un cuñado. Le dijo que no tenía el dinero encima, pero que lo iban a buscar con su abogado. El testigo le dijo que tuviera cuidado, pero Prieto le replicó: "No, no, tranquilo, que es mi abogado de mi confianza". Se fueron hacia la oficina del abogado de Prieto a conseguir el dinero. Al llegar a la oficina del abogado, estacionaron el vehículo sobre la acera y permanecieron en el vehículo en espera de que éste bajara con el dinero. No sabía el nombre, ni apellido del abogado, sólo oyó mencionar el nombre "Bronco". A través del"beeper" se le indicó que pasaran a recoger el dinero a una funeraria ubicada cerca de la Carretera Número Uno. Fueron a la funeraria y de la misma salió el Ledo. Ramón Delgado Rodríguez [el testigo identificó al abogado del apelante en corte abierta]. Permaneció en el auto mientras Prieto salió a hablar con él. Momentos más tarde, Prieto regresó al auto y le dijo "síguenos, que nos van a conseguir el dinero; vamos a un restaurant." El abogado se fue en una camioneta que conducía una muchacha. Fueron al restaurante La Alameda. En el restaurante esperaron alrededor de media hora en lo que llegaba el licenciado. Estaban hablando de las gestiones del abogado:

"Me comentó que el abogado estaba ... tenía buenas relaciones, que tenía unos papeles, el de una evidencia que le habían conseguido; o sea, que la habían prácticamente sacado de Fiscalía y que el abogado iba a ver cómo el kilo de heroína, porque en aquel entonces lo tenía la Policía, ..., a ver cómo se podía desaparecer. Eso me estaba contando en esos momentos."

El abogado llegó y se sentó en una mesa, acompañado de una mujer rubia. Saludó a Prieto y éste se levantó y fue hacia la mesa donde estaba el abogado, dialogaron un rato y éste le entrega una bolsa plástica. Entonces Prieto se levanta, viene hacia la mesa donde estaba el testigo y le entrega la bolsa. Luego de esto, se marcharon porque el testigo estaba interesado en ir a una feria. Se fueron en el auto y durante el trayecto estuvieron hablando.
Aclaró que cuando se reunió inicialmente con Prieto en el restaurante El Paseo, éste le había hablado de unas *1041 personas que le habían robado un dinero a Negri, pero que ya tenían ubicadas a las personas a quienes iban a coger porque uno de ellos estaba gastando dinero en grandes cantidades. Continuó declarando que entonces y durante el trayecto, Prieto le comentó que si se recordaba del problema que le había dicho de los muchachos que le habían robado a Negri y que si había visto los periódicos. Al indicarle el testigo que no sabía nada, le comentó: "pues los cogimos y los explotamos," añadiendo que: "ahora sí que me ranquié con Negri." Prieto le dijo que habían enviado unos colombianos dueños del dinero para que le arreglaran el asunto, pero que Negri los había despachado diciendo que él controlaba su territorio y que él iba a arreglar el problema. Dijo que habían cogido a los individuos y los habían matado. Describiendo más o menos lo que habían hecho. No dio lujo de detalles de quién participó o si fue un grupo de personas. Le dijo:

"Nosotros los cogimos, los cogimos en un carro, a uno le metimos un tiro y salió corriendo y después me fui yo atrás de él y lo alcancé. Entonces antes de yo, cuando él estaba en el piso, yo me quité la máscara y estaban los muchachos, los otros, en el carro, los otros tres; lo rematé y vi que tenía un "cadenón" grande, una cadena y se lo arranqué...

...Entonces me dijo que se había llevado los otros muchachos y los había torturao, que los habían hecho beber gasolina, que les habían sacado las uñas. Entonces, a resumen de cuentas, le pregunté que si habían recuperado el dinero y me dijo que se habían recuperado parte de las cosas, pero que todavía había algo que... otro dinero que encontrar. Eso fue todo con respecto a lo que él me dijo...".

Continuó declarando que luego llevaron a Prieto Capota a Gautier Benitez donde no pudieron entrar porque ya se encontraba la Guardia Nacional ocupando el residencial. La próxima vez que ve a Prieto Capota fue en diciembre de 1995 en la prisión federal de Guaynabo. Lo vio en la sala de visitas de la Corte Federal de la cárcel federal y Prieto Capota le preguntó si se había enterado de lo que le había pasado a David y al gringo. Le dijo que sí y Prieto le comentó, para que tu veas que todavía estando preso tengo poder. Manifestó que vio al apelante cinco (5) o seis (6) ocasiones más en la sala de visitas o en el pasillo. Indicó que en una ocasión lo trajeron a su unidad, pero que éste no quiso estar en la misma. En dos ocasiones lo llevaron a la misma unidad, pero el apelante peleaba para que lo sacaran de la misma. Manifestó que la última vez que habló con Prieto Capota fue a través de los inodoros. Explicó cómo es que se logra comunicación a través de éstos. A través de este medio, Prieto le dice: "me enteré que estás cooperando, que estás choteando, que vas a testificar en contra mía." El testigo lo niega, pero Prieto insistía en que él estaba alambrado, por lo que llamó al muchacho que le había dado el mensaje originalmente y se desnudó frente a él para que éste le dijera a Prieto que él no estaba alambrado. Continuó declarando que el apelante conocía su nombre completo, pero no sabe cómo se enteró. Le dijo que sabía que iba a cooperar y testificar en su contra y le pidió que no hiciera eso, él había bregado bien con él. Escobar Vázquez le respondió, no te preocupes, yo no voy a cooperar. Continuó declarando que el apelante le dijo que si necesitaba dinero para un abogado, él pagaba lo que fuera, que no le interesaba hacerle daño; que no se metiera en esto, que ya a él le faltaba poco. Siempre le respondía que no se preocupara, pero el apelante continuaba insistiendo. Y por último, el apelante le recordó que sabía donde vivían sus suegros y su familia en Puerto Rico. Entonces el testigo le dijo: "mira, no hablemos más de eso por aquí. Si tu quieres, dile a tu abogado que me venga a visitar y yo hablo con él." Dos o tres días más tarde prestó la declaración jurada ante la Fiscal López Mulero. Añade que para esa fecha, el apelante se encontraba en segregación.
En cuanto al arreglo con el gobierno federal, declaró que tenía un arreglo y firmó algo que le llaman la Regla 11 con el Bureau Federal, donde se le concede inmunidad por todos los crímenes que hubiese cometido a cambio de decir todo lo que había hecho. Eso incluía decir lo que había hecho con el apelante. Este acuerdo tuvo lugar en el 1994. El agente federal asignado a su caso, no tenía interés en las actividades llevadas a cabo con el apelante, pero la última vez que lo visitó en julio del 96, trajo otro agente estatal y cuando le preguntó por un individuo colombiano llamado Lucho, salió a relucir el nombre de Prieto Capota.
El agente local le dijo que había un fiscal que estaba interesado en la información que pudiera ofrecer sobre ese particular.
*1042 Continuó declarando que, a tenor con el arreglo con las autoridades federales, tenía que seguir cooperando y diciendo la verdad en todas aquellas transacciones en las que hubiese estado envuelto. Terminó su interrogatorio señalando que sólo le faltaban catorce (14) meses de cumplir por la sentencia y que debido al convenio o compromiso realizado con los federales, tenía que seguir cooperando. Añadió, entonces, que también estaba arrepentido de todas las cosas que hizo. Que estaba tratando de arreglar un poco el daño que hizo a través de sus transacciones de droga.
A preguntas del abogado de la defensa, señaló que conoció al apelante cuando éste tenía dieciocho (18) años, más o menos. Señaló que vino a Puerto Rico por primera vez en enero de 1994, luego regresó a Nueva York y volvió a finales de enero y permaneció aquí donde fue arrestado. Continuó declarando en cuanto a la cantidad de droga que le fuera ocupada y lo imputado en los diversos cargos a nivel federal. Explicó porqué en esa jurisdicción se utiliza el término multikilogram. Indicó que fue arrestado, luego de que un informante le presentó a dos agentes federales de Aduana como si fueran capitanes de barco y realizó una transacción con éstos. Se declaró culpable de los delitos imputados y la sentencia por otros cargos fue dictada en forma concurrente. Se le impuso un total de cuarenta y ocho (48) meses de cárcel y cinco (5) años en probatoria.
Reiteró que, a través del arreglo o compromiso con las autoridades federales, tenía que divulgar todo lo que había hecho en Puerto Rico, ya fuera a nivel federal o estatal. A tenor con este acuerdo, se lleva a cabo un procedimiento conocido como "debriefing" mediante el cual la persona relata todo lo que ha hecho. En cuanto a estos documentos que se preparan después de este procedimiento, indicó que éstos son sellados. El Juez Pérez Jiménez y el Negociado Federal tienen todos sus documentos sellados. Nadie tiene acceso, a menos que sea a través del juez federal. En total se llevaron a cabo como ocho (8) "debriefings" y en los dos últimos es que vino a relucir el nombre de Prieto Capota. En estos procedimientos no dio lujo de detalles sobre lo que ocurrió, ni lo que sabía sobre la masacre. Simplemente dijo que tenía información sobre la masacre. El agente estatal que lo entrevistó se llama Luis Rivera; fue él le dijo que uno de los fiscales en Puerto Rico estaba interesado en la información que él tenía. Insistió que no tenía ningún tipo de arreglo con el gobierno estatal.
Manifestó que se entrevistó por primera vez con la fiscal en agosto de 1996, pero la reunión fue muy corta debido a que fue en el área de visitas de la institución y el testigo indicó que el área no era segura para poder hablar. Continuó declarando cómo había llegado a hacer contactos en Puerto Rico y reiteró que su fruición era negociar, otros cargaban la droga. Ocupó el cargo que había dejado Melvin, quien ya no podía continuar después de enero de 1994. No volvió a ver a Melvin. Indica que David pasó a ocupar la posición de Edgar, una vez es encarcelado en las negociaciones de droga. Continuó en su declaración explicando porqué algunos detalles que no aparecen en su declaración jurada y cómo se llevaron a cabo las transacciones entre él, el apelante y las otras personas envueltas. Manifestó que el apelante le había dicho que no quería reunirse con él en Miramar porque él estaba cerca del Departamento de Justicia y que el apelante creía que él era un agente federal. El creía que el apelante le pagó el dinero que le debía a Carlos, pero no sabe cuándo se llevó a cabo tal pago.
7. La Moción de Disolución del Jurado
Al permitir el testimonio del Sr. Escobar, el Tribunal de Primera Instancia impartió la siguiente instrucción al jurado:

”[E]s conveniente que yo instruya al Jurado sobre el aspecto de derecho concerniente a este testimonio en relación con delitos que no son los que se le están imputando al acusado. La regla general, las damas y caballeros del jurado la conocen, porque ya se ha planteado esto en ocasión de otro testimonio, es a los efectos de que contra un acusado solamente es admisible, como regla general, prueba sobre los delitos que se le imputan, pero de otros delitos no. Okay. Hay excepciones en la ley que permiten que se admita bajo ciertas y determinadas condiciones evidencia de otros actos o de otros delitos. Luego de discutir los asuntos pertinentes en el día de hoy, he decidido admitir esta prueba en términos de admisión. La credibilidad, ustedes se la darán y le darán el peso que estimen, pero debo instruirlos sobre el aspecto de derecho relativo a esto. Como dije, la regla general es que sólo se permite contra un acusado prueba sobre delitos que se le estén acusando en el juicio que 
*1043
se esté ventilando. Ahora mismo se ha estado hablando sobre delitos que no son los delitos sobre lo cual el señor acusado está en estos momentos acusado. Se ha presentado evidencia y esa evidencia se trae con el propósito de demostrar que el acusado cometió un acto o delito distinto a aquél por el cual se le juzga en este caso. Tal evidencia, de ser creída, no puede ser considerada para probar que el acusado es una persona de mal carácter, ni puede ser utilizada para probar que tiene inclinación a cometer delito o a incurrir en conducta censurable. Ese no es el propósito, ni para esos propósitos puede ser admitido. Esta evidencia es recibida y admitida por el Tribunal, como dije, la admisión de una evidencia no necesariamente significa el peso que se le deba dar determinado peso. El peso o la credibilidad de cada testigo, de cada testimonio, le corresponde aquilatarlo al jurado, no al juez. Yo lo que paso crisol, o sea, paso juicio, es sobre si está permitido en ley bajo determinadas circunstancias traer determinada evidencia. Y en este caso, como dije, la regla general es que no es admisible, pero puede ser admisible bajo ciertas y determinadas circunstancias que luego de haberlas escuchado en ausencia del jurado, he determinado que es admisible y que deben ser usteles los que adjudiquen si la creen o no y el valor que ustedes le quieran conferir, si alguno, a esa persona. Esta evidencia es recibida y puede ser considerada por ustedes con el único y con el limitado propósito de determinar si la misma tiende a demostrar, y hay varias cosas que la ley permite y que me da a mí margen para admitir o no admitir, sobre identidad de la persona que cometió el delito ... (Ininteligible), delito, si alguno, por el cual se acusa al acusado. Motivo para la comisión del delito imputado. Ese es otro de los criterios que ustedes... Esta evidencia que se admita sobre delitos distintos puede ser considerada por ustedes. Otra, la intención necesaria para la comisión del delito imputado. Otra, que el acusado tenía conocimiento de la naturaleza de las cosas halladas en su posesión cuando eso es pertinente. Otra, que el acusado tenía conocimiento o poseía los medios útiles o necesarios para la comisión del delito imputado. Otra, un método, plan o designio característico en la comisión de actos criminales similares al método, plan o esquema usado en la comisión del delito imputado en este caso. Otra alternativa por lo cual puede ser considerada por ustedes, que el acusado tuvo la oportunidad de cometer el delito imputado. Otra alternativa, que los actos imputados al acusado no fueron resultado de prueba ... (Ininteligible). Ustedes deberán pesar, damas y caballeros del Jurado, esta evidencia para el propósito limitado que yo les he explicado aquí para el cual fue admitida de la misma manera que ustedes deben pesar cualquier otra evidencia admitida en el caso. Esta no es evidencia, ni más fuerte, ni menos fuerte, es evidencia sencillamente admisible, es uno de muchos otros testimonios que ustedes pueden y deben considerar. Repito, la credibilidad o el peso que ustedes le den a esto, siempre y cuando se ciña a estos parámetros limitados para los cuales ya he explicado y que establece la ley, le corresponde a ustedes. Ustedes determinan la credibilidad y el valor probatorio que tenga este testimonio. Adelante. ... ”.

El apelante solicitó la disolución del jurado, alegando que dicha prueba había sido extremadamente perjudicial. También se quejó de que el Ministerio Público no le había suministrado la información sobre los acuerdos de Escobar con el Gobierno, según solicitado. El planteamiento fue denegado por el Tribunal de Primera Instancia.
El abogado del apelante también solicitó ser relevado de su representación profesional, en vista de que el testimonio de Escobar suscitaba un conflicto en su representación. Solicitó, además, que se le concediera término al apelante para contratar un nuevo abogado. Estas solicitudes también fueron denegadas.
Al cierre de la sesión, el Ministerio Público solicitó al Tribunal que se transcribiera el testimonio del Sr. Escobar y se elevara al Tribunal Supremo de Puerto Rico para que la conducta del Ledo. Delgado "sea evaluada bajo el prisma ético, tomando en consideración las serias imputaciones que contra un abogado admitido en la práctica de la profesión, ha hecho este señor bajo juramento. ”
La solicitud del Ministerio Público fue denegada por el Tribunal de Primera Instancia, quien entendió que el planteamiento era prematuro.
Los detalles del testimonio del Sr. Escobar recibieron una extensa cubierta periodística. Al igual que sucedió con la información previamente publicada en el caso, el contenido de los artículos era inflamatorio y negativo para el apelante (viz, "Escándalo: Conocidos Abogados Pertenecen a Organización de 'Narcos'"] "Señalan un *1044 Abogado en el Juicio de Cayey"; "Bronco Establecía Coartadas a Guerrilleros").
Luego de otros trámites, incluyendo las argumentaciones finales por los representantes legales de las partes, el jurado halló culpable al apelante de la mayoría de los cargos, a base de la prueba desfilada. El 3 de marzo de 1997, el Tribunal de Primera Instancia pronunció las sentencias apeladas, según lo antes relatado.
Insatisfecho, el apelante acudió ante este Tribunal.
III
DISCUSION
En su recurso, el apelante plantea la comisión de numerosos errores por el Tribunal de Primera Instancia. Los discutimos a continuación:
1. Duda Razonable
El apelante plantea que la evidencia desfilada no estableció su culpabilidad más allá de duda razonable.
El Artículo II, Sección 11 de la Constitución consagra en nuestro ordenamiento la presunción de inocencia de todo acusado, exigiendo que toda convicción siempre esté sostenida por prueba que establezca la culpabilidad del acusado más allá de duda razonable. Véanse, Pueblo v. González Román, 138 D.P.R. 691, 707 (1995); Pueblo v. Rosaly Soto, 128 D.P.R. 729, 739 (1991).
No es necesario, sin embargo, destruir toda duda posible, especulativa o imaginaria, a los fines de establecer la culpabilidad del acusado. Es suficiente que el fallo del tribunal esté sostenido por prueba suficiente y satisfactoria, que establezca certeza y convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. Pueblo v. Rodríguez Santana, 146 D.P.R. _ (1998), 98 J.T.S. 141, a la pág. 231; Pueblo v. Cabán Torres, 117 D.P.R. 645, 653 (1986); Pueblo v. Bigio Pastrana, 116 D.P.R. 748, 761 (1985).
La duda razonable es aquella insatisfacción o intranquilidad en la conciencia del juzgador de los hechos sobre la culpabilidad del acusado, una vez desfilada la totalidad de la prueba presentada por el ministerio fiscal. Pueblo v. Torres Rivera, 129 D.P.R. 331, 341 (1991); Pueblo v. Toro Rosas, 89 D.P.R. 169, 175 (1963).
Aunque la determinación sobre la culpabilidad de un acusado es una cuestión mixta de hecho y de derecho, Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299, 316 (1991); Pueblo v. Cabán Torres, 117 D.P.R. a la pág. 655, el tribunal apelativo concede gran deferencia a la determinación que hace el juzgador de los hechos a nivel de instancia y, de ordinario, no interviene con la misma. Pueblo v. Rodríguez Santana, 98 J.T.S. 141, a la pág. 231; Pueblo v. Calderón Alvarez, 140 D.P.R. _ (1996), 96 J.T.S. 57, a la pág. 1,010; Pueblo v. Maisonave Rodríguez, 129 D.P.R. 49, 62-63 (1991); Pueblo v. Echevarría Rodríguez I, 128 D.P.R. _, a las págs. 316-317.
En ausencia de error manifiesto, pasión, prejuicio o parcialidad, no intervendremos con la apreciación de la prueba realizada por el Tribunal de Primera Instancia. Véanse, Pueblo v. Calderón Alvarez, 96 J.T.S. 57, a la pág. 1,010; Pueblo v. Chévere Heredia, 139 D.P.R. 1, 16 (1995); Pueblo. v. Meléndez Rodríguez, 136 D.P.R. 587, 622 (1994); Pueblo v. Bonilla Romero, 118 D.P.R. 92, 111 (1987).
En la situación de autos, entendemos que el récord respalda la determinación del juzgador de los hechos, el jurado. La prueba desfilada contra el apelante, en este sentido, es poco menos que abrumadora, consistiendo de numerosos testigos que situaron al apelante en el lugar de los hechos y lo identificaron como co-autor de los asesinatos.
*1045 Aunque reconocemos que casi todos los testigos eran personas de dudosa reputación --por las actividades delictivas a las cuales admitieron dedicarse — , y que, en algunos casos, su testimonio fue retractado, no por ello detectamos elementos para intervenir con la determinación del foro de Primera Instancia. El jurado tuvo conocimiento de esos mismos hechos y adjudicó la credibilidad de cada uno de esos testigos. Además, adjudicó la existencia o inexistencia de cualquier interés en las declaraciones de cada uno de ellos.
2. Publicidad Excesiva
El apelante se queja de la publicidad excesiva que rodeó el procedimiento, alegando que la misma influenció al jurado. Plantea que los numerosos artículos publicados eran sumamente inflamatorios, llegando a atacar al Juez que presidía el caso, por lo que éste debió inhibirse.
Hemos examinado el récord. Reconocemos que la publicidad generada en el presente caso fue extraordinaria y que la misma era negativa para la defensa. Ello responde a la naturaleza de los delitos y de las actividades de la banda de Negri.
Según se conoce, existe un derecho de la prensa, constitucionalmente protegido bajo la Primera Enmienda a la Constitución de los Estados Unidos y la Sección 4 del Art. II de la Constitución de Puerto Rico, a tener acceso a los procedimientos de naturaleza criminal. El Vocero v. Puerto Rico, 508 U.S. 304 (1993); Press Enterprises Co. v. Superior Court of California, 478 U.S. 1 (1986).
El acusado, en un procedimiento criminal, por su parte, tiene el derecho a gozar de un juicio imparcial, consagrado por la Sexta Enmienda a la Constitución federal y el Art. n, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico.
Se reconoce que en algunas circunstancias, estos intereses pueden resultar antagónicos, por lo que es deber de los tribunales adoptar una fórmula adecuada para lograr su reconciliación. Véase, Ernesto Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y los Estados Unidos, Vol. II, Editorial Forum, 1995, a la pág. 139.
El principio establecido en nuestra jurisdicción, en este sentido, es que la publicación de noticias acerca de los hechos de un proceso penal, no violenta per se la garantía constitucional a un juicio imparcial. Corresponde al acusado, el peso de la prueba para establecer afirmativa y satisfactoriamente que la publicidad generada ha sido de tal naturaleza, impacto y exposición, que se le privó de su derecho a un juicio imparcial. Pueblo v. Rivera Nazario, 141 D.P.R. _ (1996), 96 J.T.S. 147, a la pág. 317; Pueblo v. Moreno Morales I, 132 D.P.R. 261, 287 (1992); Pueblo v. Miranda Santiago, 130 D.P.R. 506, 511 (1992); Pueblo v. Hernández Mercado, 126 D.P.R. 427, 435-436 (1990).
En vista de que la criminalidad es uno de los problemas principales de nuestra sociedad, es natural que la ciudadanía tenga interés en seguir los reportajes sobre los actos delictivos más notorios y que la prensa tenga un incentivo para publicar este tipo de información. Una alegación de prejuicio indebido en estos casos, no puede fundarse exclusivamente en la difusión de las noticias pequdiciales o inflamatorias, sino que el que formula tal reclamo debe basar su alegación en el efecto real que la información difundida haya tenido en el ánimo de los candidatos al jurado. Pueblo v. Rivera Nazario, 96 J.T.S. 147, a la pág. 317; Pueblo v. Echevarría Rodríguez 1, 128 D.P.R. _, a la pág. 328.
Ahora bien, una vez el acusado ha demostrado que el caso ha generado publicidad masiva inflamatoria o altamente peijudicial, es deber del tribunal tomar las medidas para evitar que los miembros del jurado lleguen a juzgar el caso con opinión ya formada. Pueblo v. Rivera Nazario, 96 J.T.S. 147, a la pág. 317; Pueblo v. Echevarría Rodríguez I, 128 D.P.R. _, a la pág. 329; Pueblo v. Hernández Mercado, 126 D.P.R. _, a la pág. 435.
*1046 Entre otras cosas, el Tribunal puede: (a; celebrar un voir dire exhaustivo y riguroso; (b) puede conceder recusaciones adicionales a las partes; (c) secuestrar el jurado, una vez el mismo ha sido escogido y juramentado; (d) impartir instrucciones cuidadosas y detalladas; e, incluso, como medida extraordinaria, (e) suspender los procedimientos u ordenar el traslado del caso a otra sala. Pueblo v. Rivera Nazario, 96 J.T.S. 147, a la pág. 317; Pueblo v. Hernández Mercado, 126 D.P.R. _, a las pág. 437-438.
La mera exposición de los miembros del jurado a la información, de por sí, no descalifica a una persona para adjudicar una controversia. Pueblo v. Rivera Nazario, 96 J.T.S. 147, a la pág. 317. La cantidad de información publicada, tampoco constituye un criterio determinante para lo anterior, sino que ha de atenderse también a otros factores, tales como la naturaleza de la misma, las medidas tomadas por el Tribunal, la conducta del fiscal, los reclamos del acusado, la determinación de si el jurado efectivamente tuvo conocimiento de información del caso a través de la prensa, si tal información fue objeto de prueba en el caso y si se trata de materia admisible, y la disposición de los jurados para emitir su veredicto de conformidad con la prueba, descartando la información extrínseca. Pueblo v. Rivera Nazario, 96 J.T.S. 147, a la pág. 318.
En el presente caso, según hemos visto, el Tribunal ordenó la posposición del juicio como medida contra la publicidad excesiva. Durante distintos momentos del proceso, el foro de Primera Instancia impartió instrucciones a los miembros del jurado en tomo a su obligación de decidir conforme a la prueba.
El apelante plantea que las medidas tomadas por el Tribunal fueron insuficientes para preservar la integridad del proceso y que dicho foro erró al no conceder una nueva suspensión. Alega que la publicidad excesiva perjudicó sus derechos, particularmente una vez se diseminó la información en tomo a las imputaciones de Escobar Vázquez contra su abogado.
Consideramos que se trata de una queja legítima. Aunque el Tribunal de Primera Instancia no venía indefectiblemente obligado a conceder una nueva posposición del procedimiento, opinamos que dicho foro venía obligado a actuar de forma afirmativa para evitar que la publicidad excesiva generada en tomo al caso, afectara la validez del juicio. El foro de instancia pudo, por ejemplo, haber ordenado el secuestro del jurado o haber tomado otras medidas afirmativas para evitar o disminuir el efecto de la información publicada. Opinamos que el foro de Primera Instancia falló al no agotar las medidas sugeridas por la jurisprudencia para proteger al jurado, de forma suficiente, de la influencia de la publicidad generada en tomo al juicio.
3. La Exclusión de los Otros Abogados
El apelante plantea que el Tribunal erró al no permitir a los Ledos. Castro Pérez y Cordero unirse a su representación. Este asunto fue discutido por este Tribunal en el caso KLCE-96-00035.
La doctrina es que el Tribunal viene obligado a tomar medidas para evitar que un abogado represente a más de un acusado en una causa criminal, cuando existe conflicto en dicha representación. Véase, In Re: Soto, 134 D.P.R. 772, 779-781 (1993); Pueblo v. Padilla Flores, 127 D.P.R. 698, 701-704 (1991); Pueblo v. Gordon, 113 D.P.R. 106, 108-112 (1982); Chiesa Aponte, Derecho Procesal Penal de Puerto Rico y Estados Unidos, Vol. I, a las págs. 384-387; véanse, además, Cuyler v. Sullivan, 446 U.S. 335 (1980); Holloway v. Arkansas, 435 U.S. 475 (1978).
Los tribunales, en la esfera federal, han resuelto que en estos casos procede la descalificación del abogado, no obstante, el deseo del acusado de que continúe representándolo. Véase, Wheat v. U.S., 486 U.S. 153, 158-164 (1988); U.S. v. Locascio, 6 F.3d 924, 931-935 (2nd Cir. 1993); U.S. v. Salinas, 618 F.2d 1092, 1093 (5th Cir. 1980); U.S. v. Hobson, 672 F.2d 825, 827-829 (1 lth Cir. 1982).
En la situación de autos, la representación adicional solicitada por el apelante fue denegada porque se trataba de abogados que estaban conectados con los otros coacusados, cuyo juicio había sido separado del proceso contra el apelante, a solicitud de éste, y precisamente por la existencia de conflictos de interés.
*1047 El apelante plantea que su conflicto era más bien con "Hulk", mientras que los abogados en cuestión representaban los otros co-acusados. Lo cierto es, según indicáramos en nuestra resolución en el caso KLCE-96-00035, que era de esperar que los restantes co-acusados presentaran planteamientos armoniosos, por lo que era anticipadle que cualquier conflicto fuese extensivo a los otros. El error no se cometió.
4. Testimonio de César Escobar Vázquez
a. Inadmisibilidad
El apelante plantea la comisión de varios errores por el foro de Primera Instancia relacionados a la admisión del testimonio de César Escobar Vázquez. Dicho testigo, según hemos visto, declaró sobre varios actos delictivos cometidos por el apelante, consistentes en transacciones de drogas, que no estaban relacionados a los cargos por los cuales se le acusaba ante el Tribunal de Primera Instancia.
El principio general, recogido en la Regla 20 (B) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 20 (B), es que la evidencia de la comisión de otros delitos no es admisible para probar el carácter de una persona, con miras a demostrar que la persona actuó de conformidad con tal carácter. Véase, en general, Pueblo v. García Reyes, 113 D.P.R. 843, 855-856 (1983); Chiesa Aponte, Tratado de Derecho Probatorio, Tomo I, Publicaciones J.T.S., 1998, a las págs. 75-109; Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, República Dominicana, Facultad de Derecho Eugenio María de Hostos, 1994, a las págs. 179-183; Edward J. Imwinkelried, Uncharged Misconduct Evidence, United States, West Group, 1998, a las págs. 2-103 a 2-106, 4-2 a 4-6.
La Regla dispone, sin embargo, que, por excepción, dicha evidencia es admisible "si es pertinente para otros propósitos, tales como prueba de motivo, oportunidad, intención, preparación, plan, conocimiento, identidad o ausencia de error o accidente." Véase, en general, Pueblo v. García Reyes, 113 D.P.R. _, a las págs. 855-856 (1983); Pueblo v. Ortiz Rodríguez, 100 D.P.R. 972, 981-982 (1972); Chiesa Aponte, Tratado de Derecho Probatorio, Tomo I, a las págs. 75-109; Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, a las págs. 179-183; Edward J. Imwinkelried, Uncharged Misconduct Evidence, a las págs. 2-103 a 2-106, 4-2 a 4-6.
En el presente caso, la evidencia introducida a través del testimonio de Escobar tendía a establecer la comisión por el apelante de varias transacciones delictivas desconectadas a los hechos del caso, así como la participación del abogado del apelante en dichos negocios turbios. El cuadro del apelante, descrito por dicho testigo, era el de un narcotraficante que había sido previamente arrestado por las autoridades, y que se jactaba de sus conexiones para hacer"desaparecer" evidencia.
Es cierto que parte de la declaración del testigo Escobar se refería a admisiones del apelante relativas al asesinato de las víctimas en el caso de autos, las que eran propiamente admisibles bajo la Regla 62 de las de evidencia, 32 L.P.R.A. Ap. IV, R. 62; Pueblo v. Echevarría Rodríguez I, 128 D.P.R. 299; véase, además, Pueblo v. Fradera Olmo, 122 D.P.R. 67 (1988).
Pero la mayor parte del testimonio resultaba impertinente e inmaterial con relación a los delitos juzgados en el caso. Pueblo v. Ortiz Pérez, 123 D.P.R. 216, 227-228 (1989); Chiesa Aponte, supra, Tomo I, a las págs. 22-29; Imwinkelried, Uncharged Misconduct Evidence, a las págs. 2-99 a 2-100; cf., Pueblo v. Rosaly Soto, 128 D.P.R. 729, 748-750 (1991); Pueblo v. Mendoza Lozada, 120 D.P.R. 815, 826 (1988).
El Tribunal de Primera Instancia celebró una vista bajo la Regla 9, y aunque reconoció el potencial perjuicio de dicha prueba, decidió admitir la misma, razonando que podía recibirse con fines limitados bajo las excepciones contempladas por la citada Regla 20 (B) de las de Evidencia. El Tribunal, sin embargo, no especificó para qué fines debía considerarse esta evidencia. Su instrucción al jurado, la que hemos reproducido en este escrito, se limitó a enumerar las excepciones de la Regla 20, dejando al jurado a que adivinara cuál de ellas podría ser aplicable a la controversia.
*1048 Concebiblemente, aunque dicha conexión no es diáfana, el Tribunal tal vez consideró que la evidencia de que el apelante se dedicaba al trasiego de drogas, era admisible para establecer el móvil de los asesinatos, i.e., que las víctimas habían sido asesinadas por haberse apropiado de dinero producto de dicho negocio. Pero la prueba desfilada por el Ministerio Público durante el juicio tendía a establecer que el titular del negocio de drogas era Negri, no el apelante, y que fue a Negri al que le habían robado dinero y quien ordenó la muerte de Castro Alifonso y sus acompañantes. Dicha prueba situaba al apelante en una posición subordinada como lugarteniente de Negri, cuyas instrucciones el apelante supuestamente seguía.
La prueba sobre las actividades de compraventa de drogas del apelante, en otros momentos, resultaba, de este modo, impertinente a la controversia. Es difícil entender el rol de dicha prueba en el caso, como no fuera para sostener la inferencia prohibida por la Regla 20 (B) de que el apelante había cometido los delitos en el caso de autos porque había delinquido en otras ocasiones. Pueblo v. García Reyes, 113 D.P.R. _, a las págs. 855-856; Chiesa Aponte, Tratado de Derecho Probatorio, Tomo I, a las págs. 77-79; Imwinkelried, Uncharged Misconduct Evidence, a las págs. 4-2 a 4-6; véase, además, Pueblo v. Torres Villafañe, 143 D.P.R. _ (1997), 97 J.T.S. 93, a las págs. 1,181.1,182.
En cualquier caso, aun si pudieran admitirse otras partes del testimonio de Escobar, como serían las admisiones imputadas al apelante, no percibimos la pertinencia de traer a la atención del jurado la información de que el abogado que representaba al apelante durante el juicio, había participado en una transacción ilegal de drogas, y que el apelante se había jactado ante el testigo que dicho letrado tenía conexiones con las autoridades para hacer "desaparecer" evidencia de droga ocupada. Esta prueba era claramente perjudicial al apelante y carecía absolutamente de toda materialidad con relación a los hechos del caso.
Era obligación del Tribunal de Primera Instancia deslindar la porción del testimonio de Escobar que era admisible, suprimiendo el resto, lo que no fue llevado a cabo por la Sala recurrida. Pueblo v. Rivera Nazario, 141 D.P.R. _ (1996), 96 J.T.S. 147, a las págs. 324-325; Pueblo v. Nazario Hernández, 138 D.P.R 760, 779 (1995); Pueblo v. Ortiz Pérez, 123 D.P.R. _, a las págs. 227-230; Pueblo v. García Reyes, 113 D.P.R. _, a la pág. 855. El error se cometió.
b. Evidencia Erróneamente Admitida
Debemos considerar el efecto del error señalado sobre el veredicto de culpabilidad rendido por el jurado en este caso.
El principio general establecido en la Regla 4 de las Reglas de Evidencia de Puerto Rico, 32 L.P.R.A. Ap. IV, R. 4, es que no se dejará sin efecto una sentencia por la admisión errónea de prueba, salvo cuando dicha admisión hubiera sido un "factor decisivo o sustancial en la sentencia o decisión cuya revocación se solicita". Debe determinarse, a la luz de las circunstancias, si independientemente del resto de la prueba presentada por el Ministerio Público, de no haberse admitido la evidencia impugnada, el resultado del caso hubiese sido distinto. Pueblo, v. Rodríguez Santana, 98 J.T.S. 141, a la pág. 232; Pueblo, v. Chévere Heredia, 139 D.P.R. _, a la pág. 18 (1995), 95 J.T.S. 115, a la pág. 36; Pueblo v. Rosaly Soto, 128 D.P.R. _, a las págs. 744-747; Pueblo v. Ruiz Bosch, 127 D.P.R. 762, 781-782, n. 5, 786-787 (1991); Pueblo v. Mendoza Lozada, 120 D.P.R. _, a las págs 828-829; Pueblo v. López Rodríguez, 118 D.P.R 515, 540 n. 6 (1987); Pueblo v. Franceschini, 110 D.P.R. 794, 799 (1981); Chiesa Aponte, Tratado de Derecho Probatorio, Tomo II, a las págs. 1182-1186; Emmanuelli Jiménez, Prontuario de Derecho Probatorio Puertorriqueño, a las págs. 49-56.
En el presente caso, según indicado, el resto de la evidencia presentada contra el apelante apuntaba abrumadoramente hacia un veredicto de culpabilidad. Desde el punto de vista exclusivamente evidenciario, no estaríamos inclinados a concluir que la admisión errónea del testimonio de Escobar justificara la concesión de un nuevo juicio. Compárense, Pueblo v. Rodríguez Santana, 98 J.T.S. 141, a la pág. 232; cf., Pueblo v. Martínez Solís, 128 D.P.R. 135, 162-163 (1991).
*1049 c. Derecho a Asistencia de Abogado
Ahora bien, entendemos que el error cometido tiene una clara transcendencia constitucional, por lo que el análisis requerido no gira en tomo a la existencia o no de pmeba independiente para sostener la culpabilidad del apelante, sino al efecto de la pmeba sobre la integridad del procedimiento.
En efecto, toda persona acusada de delito tiene un derecho constitucional a una adecuada representación legal por un abogado, bajo la Sexta Enmienda de la Constitución de los Estados Unidos y bajo la Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico.
El valor perseguido por dichas cláusulas, no es el de asegurar que el resultado al que se llegue en los procedimientos judiciales sea correcto, que es la meta de la Regla 4 de las de Evidencia, sino más bien el de garantizar que los ciudadanos que son acusados de delito por el Estado sean procesados mediante procesos justos. La garantía a la asistencia de abogado constituye, de este modo, uno de los componentes fundamentales al derecho más general de los acusados a gozar de un juicio justo e imparcial también consagrado por la Sexta Enmienda de la Constitución de los Estados Unidos y la Sección 11 del Art. II de la Constitución del E.L.A., así como por la garantía al debido proceso de Ley de la Quinta y Decimocuarta Enmiendas a la Constitución federal y la Sección 7 del Art. II de la Constitución del E.L.A. Pueblo v. Fernández Simono, 140 D.P.R. _ (1996), 96 J.T.S. 49, a la pág. 944; Strickland v. Washington, 466 U.S. 668, 684 (1984); Gideon v. Wainwright, 372 U.S. 335, 342-345 (1963); Cuyler v. Sullivan, 446 U.S. 335, 349-350 (1980); Holloway v. Arkansas, 435 U.S. 475, 487-491; véase, además, Glasser v. United States, 315 U.S. 60, 75-76 (1942); Johnson v. Zerbst, 304 U.S. 458, 462-468 (1938); Joseph G. Cook, Constitutional Rights of the Acussed, United States, Clark Boardman Callaghan, 1996, a las págs. 8-3 a 8-6.
De ahí que la violación a dicho derecho, de ordinario, conlleve la concesión de un nuevo juicio al acusado. Pueblo v. Fernández Simono, 96 J.T.S. 49, a la pág. 944; Pueblo v. Ríos Maldonado, 132 D.P.R. 146, 161 (1992); Pueblo v. Gordon, 113 D.P.R. 106, 112 (1982); véase, además, Cuyler v. Sullivan, 446 U.S. _, a la pág. 350 (1980); Glasser v. United States, 315 U.S. _, a la pág. 76.
El mencionado derecho a la asistencia de abogado, no sólo requiere que el acusado goce de representación legal en los procedimientos en su contra, sino que dicha representación sea adecuada y efectiva. Strickland v. Washington, 466 U.S. _, a la pág. 686; Pueblo v. Fernández Simono, 96 J.T.S. 49, a las págs. 944-945; Pueblo v. Ortiz Couvertier, 132 D.P.R. 883, 887-889 (1993); Pueblo v. López Guzmán, 131 D.P.R. 867, 877-881 (1992); Pueblo v. Gómez Nazario, 121 D.P.R. 66, 70-71 (1988); Pueblo v. Morales Suárez, 117 D.P.R. 497, 500-502 (1986).
d. Conflicto de Intereses
No puede considerarse efectiva la representación por un abogado cuando entre éste y el acusado existe un conflicto de interés. Pueblo v. Gordon, 113 D.P.R. _, a la pág. 109; Strickland v. Washington, 466 U.S. _, a la pág. 688; Wood v. Georgia, 450 U.S. 261, 270-274 (1981); Cuyler v. Sullivan, 446 U.S. _, a las pág. 350; Holloway v. Arkansas, 435 U.S. _, a las págs. 487-491; Glasser v. United States, 315 U.S. _, a la pág. 76.
La norma es que la existencia de un conflicto real de intereses entre un acusado y su abogado, constituye, per se, una denegatoria al derecho a asistencia de abogado que requiere la celebración de un nuevo juicio. Véanse, Pueblo v. Gordon, 113 D.P.R. _, a la pág. 112; véase, además, Satterwhite v. Texas, 486 U.S. 249, 256-258 (1988); Burger v. Kemp, 483 U.S. 776, 783-788 (1987); Cuyler v. Sullivan, 446 U.S. _, a la pág. 349; Glasser v. United States, 315 U.S. _, a la pág. 76; Familia-Consoro v. U.S., 160 F.3d 761, 764 (1st Cir. 1998); Bucuvalas v. U.S., 98 F.3d 652, 655-656 (1st Cir. 1996); U.S. v. Soldevila-López, 17 F.3d 480, 485-486 (1st Cir. 1994); U.S. v. Rogers, 209 F.3d 139, 143-144 (2nd Cir. 2000); Triaría v. U.S., 205 F.3d 36, 40-42 (2nd Cir 2000); U.S. v. Levy, 25 F.3d 146, 149-152 (2nd Cir. 1994); U.S. v. Fulton, 5 F.3d 605, 609 (2nd Cir. 1993); United States v. Cancilla, *1050 725 F.2d 867, 868-869 (2nd Cir. 1984); Spreitzer v. Peters, 114 F.3d 1435, 1448-1452 (7th Cir. 1997); Cerró v. U.S., 872 F.2d 780, 783-784 (7th Cir 1989); U.S. v. Moore, 159 F.3d 1154, 1157 (9th Cir. 1998); Mannhalt v. Reed, 847 F.2d 576, 579-580 (9th Cir. 1988); Bennett L. Gershman, Trial Error and Misconduct, Charlottesville, Virginia, Lexis Law Publising, 1997, a las págs.233-241; véase, en el ámbito estatal, State v. Cyrs, 529 A.2d 947 (N.H. 1987). Véase, además, Annot., Circumstances Giving Rise to Prejudicial Conflict of Interest Between Criminal Defendant and Defense Counsel-Federal Cases, 53 A.L.R. Fed 140 (1981); Annot., Circumstances Giving Rise to Prejudicial Conflict of Interest Between Criminal Defendant and Defense Counsel-State Cases, 18 A.L.R. 4th 360 (1982).
Cuando el conflicto es real, y no meramente potencial, es innecesario que el acusado establezca que ha sufrido perjuicio. Véase, Cuyler v. Sullivan, 446 U.S. a la pág. 349 (f never a harmless error")', Glasserv. United States, 315 U.S. a la pág. 76 (”[t]he right to have assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial"); U.S. v. Gantt, 140 F.3d 249, 254 (D.C. Cir. 1998); U.S. v. Levy, 25 F. 3d a la pág. 152; U.S v. Fulton, 5 F.3d a la pág. 609; U.S. v. Jones, 900 F.2d 512, 518-519 (2nd Cir. 1990); Spreitzer v. Peters, 114 F.3d a la pág. 1450; U.S. v. Moore, 159 F.3d a la pág. 1157; Mannhalt v. Reed, 847 F.2d a las págs. 579-580.
En tales casos, procede, sin más, la revocación de cualquier convicción. Véase, U.S. v. Rogers, 209 F.3d a las págs. 142-146; U.S. v. Levy, 25 F.3d a las págs. 152-154 n.7; U.S. v. Tatum, 943 F.2d 370, 374-380 (4th Cir. 1991); Spreitzer v. Peters, 114 F.3d a las págs.1448-1452. Véase, Joseph G. Cook, Constitutional Rights of the Acussed, a las págs. 8-122 a 8-147.
Se entiende que existe un conflicto actual de intereses entre abogado y cliente cuando el abogado enfrenta cargos criminales o de naturaleza ética con relación a los mismos hechos por los cuales se está juzgando al acusado. Véase, Familia-Consoro v. U.S., 160 F.3d a las págs. 764-768; United States v. Tracy, 81 F3d 147 (1st Cir. 1996); U.S. v. Soldevila-López, 17 F.3d a la pág. 487 n. 4; Triana v. U.S., 205 F.3d a las págs. 42-44; U.S. v. Rondon, 204 F.3d 376, 379-380 (2nd Cir. 2000); U.S. v. Luciano, 158 F.3d 655, 661 (2nd Cir. 1998); U.S. v. Fulton, 5 F.3d a las págs. 609-612; Bellamy v. Cogdell, 974 F.2d 302, 306-307 (2nd Cir. 1992); United States v. Cancilla, 725 F.2d a las págs.869-871; Solina v. United States, 709 F.2d 160, 164-169 (2nd Cir.1983); véase, además, U.S. v. Sanchez-Barreto, 93 F.3d 17, 20-23 (1st Cir. 1993).
Naturalmente, cuando un abogado enfrenta posibles consecuencias adversas como resultado de su desempeño en la defensa de un acusado, ello compromete su juicio profesional. No puede esperarse que cumpla adecuadamente su obligación de representar al acusado cuando está de por medio un interés personal que puede resultar contradictorio a ello. Triana v. U.S., 205 F.3d a las págs. 42-43; U.S. v. Fulton, 5 F.3d a las págs. 609-612; Bellamy v. Cogdell, 974 F.2d a las págs. 306-307; United States v. Cancilla, 725 F.2d a la pág. 870.
El impacto de este tipo de situación, al igual que el de otro tipo de violaciones a derechos fundamentales del acusado, es de naturaleza "estructural", afectando la integridad del procedimiento. U.S. v. McDonald, 620 F.2d 559, 561-564 (5th Cir.1980); U.S. v. Sanchez-Robles, 927 F.2d 1070, 1076-1077 (9th Cir. 1991); véase, además, Chapman v. State of California, 386 U.S. 18, 23-24 (1967); Chiesa Aponte, Tratado de Derecho Probatorio, Tomo II, a las págs. 1186-1187.
Para prevenir lo anterior, se entiende que el Ministerio Público viene obligado a notificar inmediatamente al tribunal de cualquier información que daría base a la descalificación del abogado de defensa por conflicto de interés. Véase, U.S. v. Fulton, 5 F.3d a la pág. 612; U.S. v. Locascio, 6 F.3d 924, 931-935 (2nd Cir. 1993); U.S. v. Pungitore, 910 F.2d 1084, 1143 (3rd. Cir. 1990), U.S. v. Tatum, 943 F.2d a las págs. 379-380; United States v. Salinas, 618 F.2d 1092 (5th Cir. 1980); Cerró v. U.S., 872 F.2d a la pág. 787; Mannhalt v. Reed, 847 F.2d a las págs. 583-584; U.S. v. Register, 182 F.3d 820, 824-834 (11th Cir. 1999); U.S. v. Hobson, 672 F.2d 825, 826-829 (11th Cir. 1982); State v. Johnson, 823 P.2d 484, 491 (Utah App. 1991); cf., State v. Cyrs, 529 A.2d 947. Véase, Annot., Grounds for Disqualification of Criminal Defendant's Chosen and Preferred Attorney in Federal Prosecution, 127 A.L.R. Fed 67 (1995).
*1051 De esta manera, no sólo se protege el derecho del acusado a una adecuada representación legal, sino que se salvaguarda el interés por parte de los tribunales en mantener la integridad de los procesos judiciales y la confianza pública en el sistema judicial. Véase, Pueblo v. Sánchez Molina, 140 D.P.R. _ (1996), 96 J.T.S. 20, a las págs. 695-696; Wheat v. United States, 486 U.S. 153, 159-164 (1988); U.S. v. Fulton, 5 F.3d a las págs. 612-614; U.S. v. Register, 182 F.3d a las págs. 828-830; U.S. v. Hobson, 672 F.2d a las págs., 826-829.
e. Nuevo Juicio
En la situación de autos, consideramos que la admisión de la porción del testimonio de Escobar Vázquez que imputaba la comisión de delitos al abogado del apelante, dio lugar a un insubsanable conflicto de interés, que lesionaba la garantía del apelante a una asistencia adecuada de abogado y a un juicio justo e imparcial.
En efecto, el testimonio de Escobar imputaba al Ledo. Delgado haber participado en actos delictivos relacionados al tráfico de droga. Se aseveraba, además, que su cliente había dicho que él tenía conexiones y qüe estaba gestionando la "desaparición" de cierta prueba en otro asunto.
Al desfilarse dicha evidencia, el Ledo. Delgado dejó de ser un mero representante del apelante y se convirtió en un protagonista en el procedimiento, quien presumiblemente tenía conocimiento sobre los hechos aseverados. Es imposible descartar que su omisión de desmentir al testigo, lo que tal vez le requería contradecir una manifestación imputada a su cliente, no influyera sobre el ánimo del jurado al llegar a una decisión en el caso. Tampoco podemos descartar que las manifestaciones de Escobar no afectaran la efectividad de los argumentos posteriores del Ledo. Delgado ante el Jurado, particularmente en el informe ante el jurado al cierre del desfile de prueba, 34 L.P.R.A. Ap. II, R. 136.
Es evidente que el contenido de lo declarado por Escobar planteaba una situación de gravedad que afectaba al Ledo. Delgado y ponía en entredicho su solvencia moral para continuar la representación del apelante. El problema indudablemente se vio agravado por la publicidad excesiva que rodeó el juicio en todo momento; problema que, según hemos indicado, a nuestro juicio no fue adecuadamente atendido por el Tribunal.
El conflicto entre el apelante y su abogado fue real, no meramente potencial, ya que la información fue traída ante la atención del jurado. La existencia del conflicto quedó subrayada cuando el Ministerio Público solicitó al Tribunal que se elevara el asunto de la conducta del Ledo. Delgado al Tribunal Supremo de Puerto Rico.
El Tribunal de Primera Instancia., según hemos visto, denegó dicha solicitud por prematura, pero, claramente, la conducta imputada al Ledo. Delgado constituia una materia ética separada del juicio que se ventilaba ante el foro de Instancia. Nada impedía que fuese traída a la atención del organismo rector de la profesión jurídica, tan pronto la misma fue conocida. La falta de inclinación del Tribunal de Primera Instancia de dar curso a la querella contra el Ledo. Delgado, es un indicio elocuente de que el Tribunal estaba consciente de que el conflicto de interés podía afectar el proceso.
El apelante se queja de que el Ministerio Fiscal no advirtió a dicha parte o al Tribunal sobre el contenido de lo declarado por Escobar. Según hemos indicado, el Ministerio Público contaba con una declaración jurada prestada por dicho testigo, ante la misma fiscal que representó al Pueblo en el caso de autos que mencionaba por su nombre al representante legal del apelante, desde el 6 de septiembre de 1996, cuando el juicio todavía se hallaba en el proceso de selección de jurado y no se había comenzado el desfile de prueba. El Ministerio Fiscal mantuvo silencio sobre esta situación, a pesar de que para esa fecha se estaba oponiendo a la participación de los otros abogados solicitados por el apelante, basado en la existencia de conflictos de interés. De haberse advertido el Tribunal a tiempo sobre el conflicto, ello tal vez hubiera permitido que se tomaran las medidas para sustituir al Ledo. Delgado por otra representación, sin que se afectara el proceso.
Es evidente que el Ministerio Público juzgó que la declaración del testigo planteaba una conducta grave por parte del Ledo. Delgado, pese a lo cual no realizó trámite alguno para formalizar una querella contra dicha parte, *1052 sino luego de muchos meses de vista, cuando el testigo ofreció su declaración en el juicio.
Entendemos que la conducta del Ministerio Público constituyó una táctica que no debe permitirse. La misma afectó incurablemente la integridad del proceso. Véase, Pueblo v. Galindo González, 129 D.P.R. 627, 646-650 (1991); véanse, además, Darden v. Wainwright, 477 U.S. 168, 178-183 (1986); United States v. Young, 470 U.S. 1, 4-20 (1985); Donnelly v. DeChristoforo, 416 U.S. 637, 640-648 (1974); Stewart v. United States, 366 U.S. 1, 2-10 (1961); Berger v. United States, 295 U.S. 78, 84-88 (1935); U.S. v. Hernández, 750 F.2d 1256, 1257-1259 (5th Cir. 1985); Bennett L. Gershman, Prosecutorial Misconduct, United States, West Group, 1998, a las págs. 10-30 a 10-32. Procede revocar el veredicto apelado y ordenar un nuevo juicio.
Reconocemos que la anulación de un juicio constituye una alternativa de última instancia, a emplearse juiciosamente cuando no existe otra manera de salvar los errores en un procedimiento. Estamos plenamente conscientes del costo social extraordinario asociado al procedimiento de autos, el cual conllevó un esfuerzo de muchos meses por funcionarios, testigos y jueces, capturando la atención de nuestra sociedad. Tampoco estamos ajenos a que el récord sugiere, de forma abrumadora, que las alegaciones del Estado fueron substanciadas por la prueba. No damos este paso livianamente.
Nuestro sistema está fundado en el principio de que las actuaciones de los órganos del estado tienen que estar ajustadas al derecho, el cual goza de una jerarquía superior y al cual debemos supeditar las consideraciones, mencionadas anteriormente. Nuestra fe en el régimen democrático de nuestra sociedad, descánsa, no en la pureza inherente de nuestros ciudadanos, sino en la solidez de nuestras instituciones jurídicas. Al igual que otros países, existe conducta delictiva en nuestra jurisdicción. Pero lo que nos distingue como sociedad es nuestro compromiso a honrar las garantías de nuestra constitución, aun en situaciones, como la de autos, en que ello significa volver a comenzar el penoso proceso de un juicio criminal.
En la medida en que la situación de autos nos confronta con una lesión incuestionable a un derecho constitucional fundamental, es inescapable la conclusión de que debe ordenarse un nuevo juicio.
El Ministerio Público plantea que el apelante no sufrió un verdadero menoscabo a su derecho a la asistencia de abogado, por cuanto la evidencia en cuestión fue admitida en las postrimerías del proceso, cuando ya el Ledo. Delgado había tenido la oportunidad de contra interrogar los otros testigos del Estado y presentar sus planteamientos.
Precisamente porque el incidente aconteció luego de muchos meses de vista, sin embargo, entendemos que el error fue constitucionalmente perjudicial. El Ledo. Delgado solicitó ser relevado de su representación, lo que fue denegado por el Tribunal de Primera Instancia. Pero, aunque se hubiese autorizado dicho relevo en esta etapa, ya el jurado había aprendido a asociar la figura del apelante con la de su abogado, por lo que el efecto nocivo del testimonio de Escobar para el apelante, no podía ser borrado mediante esta alternativa.
Entendemos que procede revocar el veredicto.
5. Otros Errores
El apelante también plantea la comisión de numerosos otros errores de naturaleza procesal por el Tribunal de Primera Instancia. Se queja de la participación excesiva del Juez en el caso; de la admisión de cierta prueba inflamatoria (huesos y fotografías); de que el Tribunal no impartió ciertas instrucciones especiales solicitadas por la defensa sobre ciertos cargos bajo la Ley de Armas y sobre un testigo anunciado y no presentado por el Ministerio Público; de que el Ministerio Público no le suplió la información sobre los acuerdos entre el gobierno y el testigo Escobar, a pesar de haberse solicitado; de ciertos comentarios realizados por el Ministerio Público durante su informe y de algunos otros incidentes en el caso.
Hemos examinado el récord del caso y entendemos que ninguno de estos planteamientos justificarían *1053 intervenir con el veredicto. Nuestra decisión descansa, más bien, sobre el fundamento de la admisión errónea . del testimonio del César Escobar y el conflicto resultante entre el apelante y su abogado.
SENTENCIA
Por los fundamentos expresados, se emite sentencia revocando el dictamen del Tribunal de Primera Instancia y se ordena la celebración de un nuevo juicio al apelante. Se devolverá el asunto al foro apelado para procedimientos consistentes con la presente sentencia.
Lo pronunció y manda el Tribunal y lo certifica la señora Subsecretaría General.
Gladys E. Ortega Ramírez
Subsecretaría General
ESCOLIOS 2001DTA 82
1. Fue absuelto de los cargos por violación a los arts. 5 y 8A de la Ley de Armas y uno de los dos cargos por violación al art. 8 de dicho estatuto.
2. El Tribunal de Primera Instancia ordenó la concesión de juicios separados al apelante y los otros acusados en el caso, decisión que fue sostenida por este Tribunal, Pueblo v. Calderón Hernández, KLCE-96-00550 (sentencia del 23 de julio de 1996), y por el Tribunal Supremo de Puerto Rico, Caso CC96-91 (resolución del 12 de agosto de 1996).
La decisión de no autorizar la participación de los otros abogados solicitados por el apelante fue similarmente cuestionada por el apelante en dos recursos ante este Tribunal, Pueblo v. Calderón Hernández, KLCE-96-00844, y Pueblo v. Calderón Hernández, KLCE-97-00035, y sostenida por este foro mediante resoluciones emitidas el 22 de agosto de 1996 y el 22 de enero de 1997, respectivamente. La resolución de este Tribunal en el caso KLCE-97-00844 fue sostenida por el Tribunal Supremo de Puerto Rico mediante resolución emitida el 11 de octubre de 1996 en el recurso CC96-346.
.3. Tomamos conocimiento judicial de que el Hon. Pierre Vivoni, quien presidió los procedimientos en el Tribunal de Primera Instancia, cesó en sus funciones como Juez, el 30 de abril de 1997, poco tiempo después de la terminación del caso de autos.
4. La determinación de este Tribunal fue sostenida por el Tribunal Supremo de Puerto Rico, el 19 de febrero de 1997, caso CC97-74, con el voto disidente del Juez Asociado Rebollo López.
5. Según indicado, el juicio en el presente caso duró varios meses. La transcripción de la prueba consta de aproximadamente seis mil (6,000) páginas. El resumen de la misma, contenido en el informe del Procurador General, ocupa noventa y cinco (95) páginas.
Hemos procurado resumir los hechos, en lugar de los testimonios, para facilitar el manejo de la información. Como sucede con frecuencia, existen discrepancias entre las versiones de muchos de los testigos, particularmente en torno a cuestiones de cronología y otros aspectos. Hemos optado por omitir las mismas, por considerar que en ningún caso resultan determinantes, ofreciendo la versión que, a nuestro juicio, se amolda mejor al grueso de la prueba desfilada.
6. Según la prueba desfilada, Castro Alifonso había comprado este vehículo recientemente a nombre de Alfredo Rivera Torres, un hojalatero amigo suyo a quien le había llevado un "Corvette" y una motora a reparar. Castro Alifonso le dijo a Rivera Torres que necesitaba comprar el vehículo bajo el nombre de éste porque Rivera tenía buen crédito y que luego harían el traspaso, lo que nunca llegó a hacerse. El vehículo se pagó en efectivo.
7. De acuerdo al testimonio de Alex Joel Franco Cedeño, alias "'Forti", un adicto que trabajaba para la organización de Negri, este vehículo fue hurtado por él y otras personas entre el 10 y el 11 de marzo de 1994. Luego se lo vendió al apelante por $500.00.
Según surge del récord, en el referido asalto para robar el vehículo resultó muerta una persona y Forti fue acusado de *1054 "carjacking" ante el Tribunal federal, por lo que decidió cooperar con las autoridades.
8. Este último falleció de S.I.D.A.
9. Tomamos conocimiento judicial de las mismas.
10. Al Ledo. Delgado se le asoció con este sobrenombre.
11. Entre otros, el apelante invoca el siguiente comentario realizado por el Juez Vivoni en una resolución emitida el 25 de marzo de 1996: "Jamás en mis veinticinco años de abogado, prácticamente veintitrés de ellos dedicados casi exclusivamente a los asuntos de lo criminal, ..., habíamos visto una publicidad excesiva tan parcializada, inflamatoria e intensa contra acusados, abogados y hasta la propia Rama Judicial salpicando lodo contra todo el que de alguna forma ha estado cerca del caso, excepto los actuales Fiscales".